## 56405. RICKER v. HOPKINS CHEVROLET, INC. et al.

WEBB, Judge.

In May of 1975 Ricker negotiated to purchase a 1975 Cosworth Vega from Hopkins, primarily because it was represented as being an out-of-the-ordinary limited edition, high performance automobile, and therefore a good investment, but also to use for transportation to drive to work. A pamphlet furnished by Hopkins stated in part as follows: "Not all Chevrolet dealers are Vega Cosworth dealers. So there are 48 Chevrolet mobile service vans dotted around the country, each commanded by a man who knows the inside of the Vega Cosworth. So you'll have a 'pit crew' in the area. . .

"Each Vega Cosworth gets double inspections while it is being built and at the end of assembly is taken off the line. Then the engine, manifold and the fuel injection system are put into the car by the project crew.

"The Vega Cosworth is a car you can just sit in and start getting messages. Like there's a mountain somewhere that needs to be climbed, or a 12-hour stretch of highway that wants to be crossed. It's a car that begs to be given an occasional twisting, turning piece of road.

"The Vega Cosworth is a very special car.

"For a limited number of people."

When Ricker requested assurance that the car could be serviced, Hopkins responded that although the car was "flawless," it would supply special equipment and trained mechanics to maintain and service it; that it was "able to take care of the automobile"; and that it was sending a mechanic to school to learn how to use special equipment in order to keep it in perfect condition.

Ricker purchased the automobile for $6,431, obligating himself to pay $180.42 a month for 42 months in addition to a down payment of $1,000. On the day he picked it up he was aware that Hopkins had not "done all of the cleanup on it," but he took it home to drive over the weekend and planned to bring it back on Monday to have the necessary work finished. By the time he got the car home he noticed a number of defects, including ripped window gaskets, "some big dents in the roof," the hood sunken so that it was not flush, upholstery pulling off the door panels and mismatched paint on the door. He also noticed after traveling about 25 miles that the odometer registered close to 100 miles and that there were problems with the engine missing.

Returning the car to Hopkins on Monday, Ricker told Hopkins' salesman that he did not want the automobile the way it was, but was assured that they would be able to fix it and get it running and back into new condition. When he picked the car up the following Saturday the engine problem had not been corrected and when he accelerated with any force at all, it stopped running. The problems got worse and the car stopped running altogether one morning on his way to work.

Ricker was informed in June or July that the special equipment and tools to work on the car had never been delivered and nobody at the dealership was trained to work on the Cosworth at that time. He returned the car to be serviced on nine or ten occasions and each time was assured that the defects could be remedied. Each time the car was in the shop Ricker was forced to rent a car for transportation to and from work. Even when the car did run, its "cutting out" rendered driving so hazardous that it precluded its use for the ordinary purpose of

transportation. Eventually it quit running entirely and could not be started.

Ricker then attempted to enlist General Motors' aid and telephoned Detroit, which referred him through its maze of heirachy back to the zone office and training center in Atlanta. The car was sent to the testing grounds in Chamblee where it was used for a week to train GM's service representatives "on how to work on the equipment." When he went back to Hopkins to pick it up he drove about three blocks and brought it back with the same problems, asking Hopkins' service manager to ride with him so he could demonstrate the trouble. The service manager refused, telling him: "Mr. Ricker, I don't want to ride with you in it. I don't want you to bring the car back down here any more. [The GM representative] is a specialist and if he can't fix it nobody can."

At this point, approximately three months after the purchase of the automobile, Ricker told Hopkins' sales manager that since they couldn't get the car running right he wanted his money back. Hopkins refused the tender, advising Ricker that it was his "problem," and Ricker filed the instant suit. The car sat in Ricker's garage for over a year, resisting all efforts at repair. In 1977 the GM specialist came to the house to look at the car again. He "tinkered around with it for about an hour and a half and could not get it started," finally concluding that "every automobile manufacturer builds one that is not up to standard," and "this probably just is one of those automobiles." The car thereafter remained in Ricker's garage.

At trial it was undisputed that the purchase price of the Cosworth was $6,431 and that the price paid as of the date of trial was $7,134.28. Ricker testified without objection that the car was useless and there was nothing he could do with it, and that the fair market value in his opinion was the purchase price. In his offer of proof Ricker indicated that his opinion was based on his buying and selling at least ten other automobiles; his having checked with the dealers to become familiar with information about the market value of this type of car; his reading articles and magazines about Cosworth Vega; his discussions on the condition of his automobile with

dealers and other "specialists"; his possession of the car for three years and knowledge of its condition; and his use of the car and its mileage and purchase price. It was also undisputed that Ricker incurred expenses of specific sums in maintaining the automobile including taxes, finance charges, insurance, rental for replacement vehicles and attorney fees.

However, on objection by Hopkins, the court ruled that Ricker was incompetent to testify as to the fair market value of the automobile and directed a verdict against him for failure to adduce sufficient proof of damages, holding that the Cosworth Vega was so unique that its value could be established only through expert testimony. We disagree, and accordingly must reverse.

It is well-established that one need not be an expert to testify as to value if he has had an opportunity to form a correct opinion. Code § 38-1709; *Dickens v. Adams,* 137 Ga. App. 564, 566 (5) (224 SE2d 468) (1976). "In *Sisk v. Carney,* 121 Ga. App. 560, 563 (174 SE2d 456), it was held: 'Opinion evidence as to the value of an item, in order to have probative value, must be based upon a foundation that the witness has some knowledge, experience or familiarity with the value of the property in question or similar property and he must give reasons for the value assessed and also he must have had an opportunity for forming a correct opinion. Code §§ 38-1708, 38-1709; *Hoard v. Wiley,* 113 Ga. App. 328 (1a, b) (147 SE2d 782). Absent this foundation, the opinion as to value is inadmissible as it is nothing more than an "unsupported conclusion or guess of the witness." Id., p. 322.' " *Abbott v. State,* 130 Ga. App. 891, 892 (1) (205 SE2d 14) (1974).

A review of the evidence here reveals that while the type of automobile purchased by Ricker was a "limited edition," it was still a General Motors assembly-produced vehicle. There was no evidence as to how many of these models were manufactured, that it was a collector's item, an antique or classic car, or whether it had intrinsic value because of its uniqueness. It was clearly not sold as a one-of-a-kind, hand-tooled, custom-made, special-design model, however, but was marketed through a regular GM dealer in the normal course of business as are all other

models.

Thus, while Cosworth Vega may not be so proliferous as CB radios, and thus classifiable as "everyday objects" (*Hayes v. State,* 139 Ga. App. 316 (1) (228 SE2d 585) (1976)), we think they can properly be grouped in the same category as Cadillacs, Lincoln Continentals or certain imported cars universally considered to be "very special cars for a limited number of people." Therefore we think that here, as in *Smith v. General Fin. Corp.,* 143 Ga. App. 390 (1) (238 SE2d 694) (1977), where the plaintiff's claim for damages was based solely on her opinion of the value of her Cadillac, there was a jury issue presented as to actual damages and it was error to grant Hopkins' motion for directed verdict.

*Judgment reversed. Quillian, P. J., and McMurray, J., concur.*

ARGUED SEPTEMBER 6, 1978 — DECIDED OCTOBER 2, 1978.

*Kutak, Rock & Huie, Terrence Lee Croft, Denise Caffrey,* for appellant.

*Lokey & Bowden, Glenn Frick, Robert P. Bleiberg, King & Spalding, Nolan C. Leake, Byron Attridge,* for appellees.