74111. BUILDERS TRANSPORT, INC. v. HALL.
(360 SE2d 60)

BANKE, Presiding Judge.

Appellee Hall was employed by the appellant, Builders Transport, Inc., as a salaried truck driver until 1979, when Builders Transport offered him the opportunity to purchase a 1973 Kenworth truck tractor and to begin driving for the company as an independent con-

tractor. The parties entered into two contracts governing the new arrangement — a "Contractors Operating Agreement" and an "Installment Conditional Sales Contract." By its terms, the operating agreement could be terminated by either party for any reason upon 10 days' notice, or it could be terminated immediately in the event of a material breach. While it was in force, it obligated Hall to comply with all safety regulations applicable to the company's drivers. Pursuant to the sales contract, the company was authorized to repossess the tractor immediately in the event of the termination of the operating agreement, whether upon 10 days' notice or upon a material breach. The sales contract additionally authorized Builders Transport to repossess the vehicle in the event it deemed itself "insecure for any reason."

Hall drove for Builders Transport as an owner-operator pursuant to the new arrangement until July of 1980, when he complained of being assigned unprofitable trips and not being provided return loads to his home city. It was Builders Transport's position that, during a meeting with a company vice-president called for the purpose of discussing this complaint, Hall acted in an angry and "irrational" manner. After investigating his complaint, the company concluded that Hall had been treated fairly, but because of his demeanor at the meeting a decision was made to inquire further into his general conduct and attitude.

Less than three weeks later, while Hall was in "the fuel line" refueling his truck, he had a conversation with the company's safety director, wherein he asked why he had not been paid additional compensation under the company's safety bonus program for the prior quarter, as he always had in the past. According to Hall, the safety director told him that, as an independent owner-operator, he was no longer eligible for such bonuses, to which he (Hall) responded that he could not understand why a distinction was made between company drivers and owner-operators since they were all required to abide by the same safety regulations. The safety director's version of this conversation differed considerably from Hall's. It was his position that when Hall was informed of his ineligibility for the bonus, he stated that he no longer intended to comply with the company's safety regulations.

Based on his own conversation with Hall during their July meeting and on the safety director's account of his discussion with Hall, the company's vice-president conferred with counsel and made a decision to terminate Hall's employment. On July 17, 1980, prior to being informed of his termination, Hall made a routine telephone call to the company's dispatcher to inquire if there was a load for him to pick up. The dispatcher instructed him to drive his truck to the company's office in Savannah for a meeting with company officials. Hall did so

and, after arriving in Savannah and refueling and parking his truck, was told by the dispatcher that his employment had been terminated. Hall then asked to see the vice-president, who confirmed the termination of his contract and advised him that his tractor had been seized. A letter formally notifying Hall of the termination of the contractor's operating agreement was prepared that same day, i.e., July 17, 1980, and was subsequently delivered to him. It is undisputed that all installments then due under the sales contract had been made as of that date.

Five months later, Builders Transport notified Hall that the sales contract was deemed to be in default. Subsequently, on February 2, 1981, the company sought a writ of possession for the tractor based on Hall's alleged delinquency in making the installment payments. Hall counterclaimed, seeking actual and punitive damages for breach of contract, unlawful conversion, and wrongful repossession. Builders Transport's claim for a writ of possession was disposed of by a consent judgment, leaving the counterclaims to be tried before a jury. The jury awarded Hall $11,454.90 on the breach of contract claim and actual damages in the amount of $830.95 on the tort claim, the latter award apparently reflecting the value of certain tools left in the truck. Additionally, the jury awarded punitive damages in the amount of $100,000. Builders Transport filed this appeal from the denial of its motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial. *Held*:

1. Builder's Transport contends that the award of damages in the amount of $11,454.90 for breach of contract was contrary to the evidence.

The trial court correctly charged the jury that if they found Builders Transport to be in breach of the sales contract, they would be authorized to award Hall the fair market value of the truck, less the indebtedness still owed under the sales contract. The sole evidence presented by Hall concerning the market value of the vehicle at the time of the alleged breach consisted of his testimony that he had paid $12,000 for it and that he had expended approximately $8,000 on maintenance and repairs during the time it had been in his possession. Builder's Transport countered this testimony by introducing a sworn statement which Hall had given in connection with prior bankruptcy proceedings valuing the tractor at $5,000. The jury's award of $11,494.90 evidently reflected a valuation of approximately $20,000, less the approximately $10,000 still owing on the contract, plus an award of $1,494.90 for 10 days' loss of use of the vehicle resulting from the company's breach of the 10-day notice requirement set forth in the operating agreement.

"Opinion evidence as to the value of an item, in order to have probative value, must be based upon a foundation that the witness

has some knowledge, experience or familiarity with the value of the property in question or similar property and he must give reasons for the value assessed and also he must have had an opportunity for forming a correct opinion. [Cits.]" *Ricker v. Hopkins Chevrolet*, 147 Ga. App. 358, 361 (248 SE2d 720) (1978). See also OCGA § 24-9-66. No such foundation was established in this case, and, indeed, no opinion was ever offered by Hall as to the vehicle's value at the time of its repossession. While the purchase price of a motor vehicle is relevant and admissible to establish its value at the time of purchase, it is obviously not, standing alone, sufficient to establish the value of the vehicle at some later point in time. See *Nail v. Hiers*, 116 Ga. App. 522, 524 (157 SE2d 771) (1967). Similarly, the value of a motor vehicle cannot be established merely by adding to its purchase price the cost of maintaining and repairing the vehicle. In the absence of any opinion testimony concerning the actual market value of the vehicle at the time of its repossession and in the absence of any evidence which might have enabled the jury to reach its own conclusions as to such value, the award of $11,459.90 as damages for breach of contract must consequently be reversed.

2. The appellant contends that the court erred in charging the jury that the company's liability in tort was not contingent upon whether it had acted in good faith. Specifically, the court charged as follows: "Generally speaking, the owner of personal property is entitled to its possession. Any wrongful deprivation of such possession is a tort for which an action lies. When one meddles with another's property, he does so at his own peril. If he had a right to do it, what he did was legal; if he had no right to do it, what he did was illegal. And it makes no difference as to the legality or the illegality of it that he acted in good faith. Good faith may be relevant to the damages, if any, as I will explain later, but good faith is not relevant to deciding whether or not a conversion or trespass to chattels was or was not legal. Either it was or it wasn't."

We agree that this portion of the jury instruction, while abstractly a correct statement of the law of conversion, was misleading in the context of the facts of the present case. Builders Transport defended the tort claim in part on the basis that it had properly exercised its right to terminate the operating agreement under the provision permitting it to do so in the event it felt "insecure for any reason." To establish a good-faith basis for its actions in this regard, it relied both on its version of the conversation between Hall and the safety director and on Hall's alleged conduct during his initial meeting with the vice-president.

Pursuant to OCGA § 11-1-208, the right of a seller under a conditional sales contract to exercise an "at will" or "when he deems himself insecure" acceleration provision applies only where the seller "in

good faith believes that the prospect of payment or performance is impaired." However, in such a case, "the burden of establishing lack of good faith is on the party against whom the power has been exercised." Id. See *Ginn v. C & S Nat. Bank,* 145 Ga. App. 175 (1) (243 SE2d 528) (1978). The issue is "not whether the [seller] was in fact insecure, but whether in determining the loan insecure the [seller] acted honestly, in good faith, and not arbitrarily or capriciously. [Where the evidence on the issue is contested], the contest must be resolved by the trier of fact. 'Good faith . . . is always a question for the jury. Even though the party may swear he acted in good faith, the jury may decide he acted in bad faith from consideration of facts and circumstances in the case.' " *Ginn,* supra at 177, citing *Hodges v. Youmans,* 129 Ga. App. 481 (200 SE2d 157) (1973). In view of the applicability of OCGA § 11-1-208 to this transaction, we must conclude that the trial court's charge on the irrelevance of good faith was so misleading as to constitute reversible error with respect to the award of damages in tort. That portion of the judgment is accordingly reversed.

3. It is well settled that a claim for punitive damages will not lie in cases arising on contracts. See OCGA § 13-6-10. "This is true even though the [breaching party] may be in bad faith." *Horne v. Drachman,* 247 Ga. 802, 809 (280 SE2d 338) (1981). Having reversed the tort recovery, we must accordingly also reverse the award of punitive damages.

4. We do not reach the merits of the appellant's remaining enumerations, as the alleged errors complained of are not likely to reoccur upon any retrial of the case.

*Judgment reversed. Carley and Benham, JJ., concur.*

DECIDED JULY 14, 1987 —
REHEARING DENIED JULY 27, 1987 — ▮▮▮▮▮▮▮▮

*Griffin B. Bell, Jr., Andrew J. Hill III, Edward M. Hughes,* for appellant.

*Michael A. Lewanski, John R. Calhoun,* for appellee.