**SUMITOMO MARINE & FIRE INSURANCE COMPANY OF AMERICA, Plaintiff,**

v.

**SOUTHERN GUARANTY INSURANCE COMPANY OF GEORGIA and Columbia National Insurance Company, Defendants.**

No. 1:02 CV 584 CAM.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 27, 2004.

David Hunt Wilson, Hawkins & Parnell, Atlanta, GA, Richard H. Nicolaides, Jr., Bates & Carey, Robert S. Marshall, Bates & Carey, Chicago, IL, William Henry Major, III, Hawkins & Parnell, Atlanta, GA, for Sumitomo Marine & Fire Insurance Company of America, Plaintiff.

Robert Malcolm Darroch, Mabry & McClelland, Stephanie Ellen Feingold, Mabry & McClelland, Atlanta, GA, William

Anthony Dinges, Temple Strickland Dinges & Schwartz, William D. Strickland, Temple Strickland Dinges & Schwartz, Decatur, GA, for Southern Guaranty Insurance Company of Georgia, Columbia National Insurance Company, Defendants.

## ORDER

MOYE, District Judge.

The above styled action is before this court on 1) plaintiff's motion for summary judgment with respect to defendants' counterclaims [# 63]; 2) plaintiff's motion for summary judgment with respect to plaintiff's first amended complaint [# 64]; 3) defendant Southern Guaranty Insurance Company of Georgia's motion for summary judgment [# 65]; and 4) defendant Columbia National Insurance Company's motion for summary judgment [# 66].

## FACTS

SMG development Associates, L.P. ("SMG") was the owner of a residential housing development in Gwinnett County, Georgia, known as the Hamilton Mill Project. (Padget Dep., at p. 18). SMG hired Arris Contracting, Inc. ("Arris") as a general contractor for infrastructure work on the Project but not for the building of any homes. (Id., at p. 10). As a condition to doing any work for SMG, SMG required all contractors, including Arris, to provide SMG with additional insured status under the contractor's policies. (Id., at pp. 21, 24). Pursuant to various contracts between Arris and SMG related to Arris's work at the Hamilton Mill Project, Arris's responsibilities included (but were not limited to) hiring subcontractors, scheduling and coordinating subcontractors' work and assuring that work was performed in compliance with all plans and specifications. Some contracts stated that SMG would

indemnify Arris for "all claims, losses and liabilities resulting from damage to property ... arising out of acts or omissions of [Arris], except in cases of willful misconduct or gross negligence ...." (Southern's Exhibit A). Arris's work included, among other things, clearing, grubbing and erosion control work, as well as development of streets and lots. (Padget Dep., at p. 10). Arris was not involved in the building, selling, renting or advertising of any homes or any other structures. (Hill Dep., at p. 17). Arris's work at the Hamilton Mill Project began in October of 1993. It continued through the mid-nineties.

Homeowners surrounding Hamilton Mill filed seven lawsuits between 1998 and 1999 against SMG, Arris and others.[1] (Amended Complaint, at ¶¶ 10–21; Exhibits A and B). Four of those homeowners owned property directly adjacent to Hamilton Mill along a small boundary stream, which was also adjacent to Jim Moore Road (collectively referred to herein as the "Jim Moore Road Plaintiffs"). (Id.). Three other homeowners owned property across from Jim Moore Road but along the Little Mulberry River (collectively referred to herein as the "Little Mulberry River Plaintiffs"). (Id.).

The underlying homeowner lawsuits alleged that the construction and development activities of Arris and SMG, among others, led to the property damage. (Amended Complaint, Exhibit B). The Jim Moore Road Plaintiffs alleged that, beginning in 1996, the flow of water into the boundary stream increased, the stream bed began eroding, and their property became filled with large quantities of sediment. (Id.). As a result, the Jim Moore Road Plaintiffs sued SMG, Arris and others under various theories, which ultimately concluded with verdicts award-

---

1. Plaintiff was never named as a party in the lawsuits.

ing damages in their favor in one case and settlements in the others.[2] (Id.). The Little Mulberry River Plaintiffs alleged similar damages as a result of sediment deposited by the Little Mulberry River. (Id.). SMG and Arris settled the Little Mulberry River cases.

Plaintiff Sumitomo Marine & Fire Insurance Company of America ("Sumitomo") issued Commercial General Liability policies to SMG, including Policy No. PKG 3000167–07, effective December 31, 1996 through December 31, 1997, and Policy No. PKG 3000168–08, effective December 31, 1997 through December 31, 1998 (hereinafter referred to as the "Sumitomo Policies"). (Amended Complaint, at ¶ 25). Under these policies, the following are insureds: "[A]ny person (other than your employee), or any organization while acting as your real estate manager …" (Southern's Exhibit H). Sumitomo defended and indemnified SMG under a reservation of rights for the underlying homeowner lawsuits pursuant to the above-referenced primary general liability policies. (Leskauskas Dep., at p. 23).

Defendant Southern Guaranty Insurance Company of Georgia ("Southern") issued General Liability Insurance policies to Arris, including Policy No. CPFF663, effective September 1, 1996 to September 1, 1997, which was renewed and made effective for the period of September 1, 1997 to December 31, 1997 (hereinafter referred to as the "Southern Policies"). (Criswell Dep., at pp. 17–18). Southern defended and indemnified Arris for the underlying homeowner lawsuits. (Id., at pp. 48–49, 59). Defendant Columbia National Insurance Company ("Columbia"), through its related entity and agent, Columbia Insurance Group, issued a General Liability Policy to Arris, Policy No. CMPAG 06255, effective December 31, 1997 to December 31, 1998 (hereinafter referred to as the "Columbia Policy"). (Hubbard Dep., at pp. 18–19). Columbia defended and indemnified Arris for the underlying homeowner lawsuits under this policy of insurance without reservation (Id., at p. 30). Defendants have admitted that their policies of insurance provided liability coverage to Arris for the underlying homeowner lawsuits. (Plaintiff's Statement of Undisputed Facts, at ¶ 94). Defendants' policies were countersigned by Dean Hayes. (Hayes Dep., at pp. 13, 58–60).

In addition, Dean Hayes issued the following three certificates: 1) a certificate dated December 3, 1996, which identifies the 1996 to 1997 Southern Policy; 2) a certificate dated September 5, 1997, which identifies the Southern Policy effective September 1, 1997 to September 31, 1997; and 3) a certificate dated August 25, 1999, which references the amended Southern policy period. (Hayes Dep., at pp. 74–76, 83–85). All certificates identify the "certificate holder" as SMG (hereinafter referred to as the "Southern Certificates of Insurance," the "Certificates of Insurance," or the "Certificates"). (Id., at pp. 74, 78). Hayes further included on the Certificates the following language: "Certificate Holder is named additional insured as their interest may appear." (Id., at pp. 75–78). The Certificates contained the following disclaimer language:

> This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certifi-

---

2. In the first of the Jim Moore Road cases, *Lewis McKinney and Janit McKinney v. SMG Associates, LP, et al.,* Fulton County Superior Court (CAFN 1999 CV 05635), a verdict was returned finding that SMG and the other defendants were responsible and that Arris was not responsible. This decision was never appealed and it is final.

cate does not amend, extend or alter coverage afforded by the policies below.

. . . . .

The insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies.

(Southern's Exhibit C). The Certificates were signed by Hayes as the authorized representative of Southern. (Id., at pp. 76, 85).

Hayes also issued a certificate of insurance identifying the Columbia Policy (hereinafter referred to as the "Columbia Certificate of Insurance," the "Certificate of Insurance," or the "Certificate"). (Id., at pp. 85–86). This Certificate also identifies the "certificate holder" as SMG and states that SMG is an additional insured. (Id.). Hayes signed this Certificate as the authorized agent of Columbia. (Id., at pp. 85–86). Like the Southern Certificate, the Columbia Certificate also expressly includes the disclaimer language quoted above. (Plaintiff's Exhibit 43). No endorsement to the Columbia Policy adding SMG as an additional insured was ever issued by Columbia. (Hayes Dep., at p. 136; O'Reilly Dep., at p. 88).

Neither Southern nor Columbia issued any endorsement to their policies that would limit, amend or condition the coverage provided to SMG. (Plaintiff's Statement of Undisputed Facts, ¶¶ 89, 93). No additional premiums were paid for SMG as an additional insured. (Hayes Dep., at p. 150).

Dean Hayes testified that it was his intent to make SMG an additional insured under both the Southern and Columbia Policies and that it is his understanding that SMG was an additional insured under both Policies. (Id., at p. 105). Hayes believes that he was authorized to prepare and issue the Certificates of Insurance.[3] (Id., at p. 86). He had authority to issue the Certificates of Insurance under the agency agreements he had with defendants. (Id.). Furthermore, Hayes testified that he was not required to seek approval from Southern or Columbia before issuing the Certificates of Insurance. (Id., at p. 90). In addition, Hayes testified that he, as the authorized representative of Southern and Columbia, advised SMG that it was an additional insured under both the Southern and Columbia Policies by sending SMG copies of the Certificates of Insurance. (Id., at pp. 105–6). SMG would not have received anything else from Hayes other than the Certificates of Insurance. (Id., at p. 100).

As a matter of general practice at Hayes's insurance agency, certificates of insurance indicating that the holder is a named additional insured would be issued at the request of the insured. (Id., at p. 91). Also per customary practice, one copy of the certificate would go to the holder, one copy would go to the insurer, and one copy would go to the named insured. (Id., at pp. 94–95). Hayes testified that he is certain that copies of the Certificates of Insurance would have been sent to SMG, Arris, and Southern/Columbia pursuant to his agency's standard operating procedure.[4] (Id., at pp. 95–96, 136).

---

**3.** The Certificates issued by Hayes were on forms issued by the ACORD Company and were not directly issued by Southern or Columbia.

**4.** Hayes testified that because having an entity named as an additional insured to a policy is considered an administrative, clerical-type function, a customer service representative ("CSR") at his agency would have received Arris's request to add SMG as an additional insured and the CSR would have followed the customary operating procedures for adding SMG as requested. (Hayes Dep., at pp. 71, 77, 78, 81).

According to Hayes, with respect to copies of certificates of insurance sent to insurers during the time period at issue, the mid–1990's, in most instances his agency would not receive a response from the insurance company.[5] (Id., at p. 98). In addition, Hayes testified that it would have been uncommon at the time for Southern or Columbia to charge an additional premium in the event that an entity was added as an additional insured under one of their policies. (Id., at pp. 101–3).

Hayes derives his agency authority in part from agency agreements between Banks–Moneyhan–Hayes and Southern/Columbia (hereinafter referred to as the "Agency Agreements"). (Id., at pp. 31, 35–36, 43). Banks–Moneyhan–Hayes, Hayes's agency, has been the authorized independent insurance agent of Southern since 1964. (Id., at pp. 30–36). Under the Agency Agreements between Southern/Columbia and Banks–Moneyhan–Hayes, in effect during the relevant Southern/Columbia Policy periods, Hayes had authority to bind and execute insurance contracts, and to provide all usual and customary services of an agent on all insurance contracts placed with Southern subject to underwriting rules, requirements and restrictions of Southern/Columbia. (Id., at pp. 31, 35–36, 43, Exhibits 27, 38).

It is not disputed that Arris relied on certificates of insurance as proof of insurance coverage of his subcontractors. (Hill Dep., at pp. 24–5). Furthermore, Arris relied on Hayes to procure insurance and to make changes to insurance policies and communicated almost exclusively with him with respect to insurance. (Hill Dep., at pp. 28–30).

Dale Kocher manages the agency relationships for Southern. (Kocher Dep., at p. 5; Plaintiff's Exhibit M). According to Kocher, the agents of Southern have the authority to bind and execute insurance coverage. (Id., at p. 11). Kocher testified that if an insured wanted to add an entity as an additional insured under a Southern policy, the insured would communicate directly with the agent and not with Southern. (Id., at p. 29). More specifically, Kocher testified as follows:

An applicant or an insured has made a request of an agent to perform a partic-

**5.** In this regard, Hayes further testified:

Q: Do you recall an instance where your company issued a certificate of insurance indicating that a certificate holder had been named as an additional insured and the insurance company, Southern Guaranty or Columbia Mutual, got back to you and said no, they are not an additional insured?

A: I do not recall that instance.

Q: Do you recall instances where Columbia Mutual or Southern Guaranty responded back to you and forwarded a copy of an endorsement to the policy such as an additional insured endorsement?

A: Yes, I do. I have— yes.

Q: In what instances would you receive a copy of endorsement and in what instances would you not?

A: I do not know that there was a specific reasoning behind that.

Q: Okay, And if I'm understanding your testimony, in some instances you would hear nothing from the insurance company, correct?

A: Under my opinion at the time? I think in most instances you would hear nothing.

Q: Okay. So your assumption was what?

A: It was fine with everybody.

Q: Okay. Meaning the fact that—

A: We even had some insurance companies that actually told us they didn't want certificates anymore, don't even send them to us, we don't want to see them.
(Hayes Dep., at pp. 97–98).

ular act on his behalf to provide coverage for a certain insurance and the agent, through his knowledge and understanding of underwriting rules, says "yes, I can do that" or "no, I cannot do that." And if he says, "Yes, I'll take care of it," then normally coverage is bound.
(Id., at p. 45).

According to Bert Shephard, Southern's underwriting manager, Southern's agents did not have the authority to issue a certificate that reflected that the certificate holder was an additional insured on a Southern insurance policy. (Shephard Dep., at p. 29). Shephard testified, however, that Southern itself would rely on certificates of insurance as proof of insurance. (Shephard Dep., at p. 40). Shephard further testified that it was normal practice in the construction industry for an insured to rely on certificates of insurance rather than actual policies of insurance. (Id., at p. 41).

Robert O'Reilly, Jr. is a representative of Columbia, who is knowledgeable with respect to underwriting of the Columbia Policy. (Plaintiff's Statement of Undisputed Facts, ¶ 63). According to O'Reilly, Columbia relies on its agents to originate business, and its agents are the source for new business, i.e., the point of sale. (O'Reilly Dep., at p. 27). O'Reilly testified that, "with respect to an agent's ability to bind coverage, authority to bind coverage on behalf of [Columbia], ... the agent's authority is defined by the agency agreement and the underwriting rules." (Id., at p. 52). The Agency Agreement also provides the agent with authority to countersign certificates of insurance. (Id., at p. 42).

O'Reilly also testified that, during the relevant periods of time, the procedure for having an entity included as an additional insured under the Columbia Policy required that the request "be approved by the underwriter and then sent through to be endorsed on the policy." (Id., at 62). O'Reilly explained that "[t]here must be ... an amendment to the policy itself to afford coverage to an additional insured." (Id., at 63). O'Reilly then testified that this was required by paragraph C of the Agency Agreement. (Id., at 64). O'Reilly further testified that an additional insured typically receives a certificate of insurance, which the agent would provide to the holder of the certificate. (O'Reilly Dep., at p. 69). If an actual policy endorsement was issued, however, that policy endorsement would go only to the agent, and perhaps to the named insured. (Id.). A certificate of insurance can provide information to an interested third-party as to its status as an additional insured. (Id., at p. 70).

Plaintiff's expert, Donald S. Malecki, is a Certified Property and Casualty Underwriter who wrote a treatise entitled *The Additional Insured Book*, International Risk Management Institute, Inc., 4th Edition (2000).[6] Malecki, having reviewed all the relevant materials in this case, including the policies, certificates and testimony, wrote, among other things, as follows:

> When a certificate of insurance therefore confirms that a policy includes additional insured status, and the certificate is completed by an authorized representative of the insured, who also happens to be the agent of the client on whose behalf the certificate has been issued, the coverage should be provided and the matter settled later between the insurers and the insurance agent who completed the certificates.

(Malecki Affidavit and Report, at pp. 5–7). In addition, Malecki states the following with respect to underwriting custom and practice:

---

6. Defendants have not submitted an expert's opinion in this case.

[W]hether an underwriter charges a premium to add an additional insured is strictly discretionary. Ask underwriters what they charge to add others as additional insurers and the answer will vary. Some charge and others do not. There also is no set rule or pattern among underwriters concerning price. Whether a price has been charged for the additional insured's status, therefore, does not matter. The policy still applies subject to its terms and conditions.

(Id., at pp. 8–9). In conclusion, Malecki states:

Mr. Dean Hayes and his agency was a licensed insurance agent of Southern Guaranty and Columbia National. It also had an agency agreement that did not restrict the addition of other persons or organizations to existing policies, nor was there any restriction in the manuals applied to it by these insurers.

Mr. Dean Hayes testified that he intended that SMG Development be an additional insured on the commercial liability policies of each of these insureds. While the certificate of insurance does not amend, extend or alter the terms of a policy, he had the power to bind, had the authority to act on behalf of the insurers, and represented to SMG Development that it was a covered additional insured. To now deny SMG Development the coverage it bargained for with Arris Contracting, Inc., SMG Development is being punished for having reasonably relied on a representation that was not truthful to its detriment.

(Id., at pp. 10–11).

Edward Padget was Vice President of Construction Development for SMG relating to the Hamilton Mill Project from October 1993 until April 1998. (Padget Dep., at p. 24). In that capacity, Padget was familiar with SMG's practices as they related to requiring its contractors and subcontractors to have SMG named as an additional insured under those contractors' policies. (Id., at p. 21). Padget has been involved in the construction industry for more than 20 years. (Id.). Padget testified that it was customary for SMG, and standard industry practice, to have an owner, in this case SMG, made an additional insured under its contractors' policies. (Id.). SMG, in turn, would rely on certificates of insurance to confirm that its contractors, such as Arris, had made SMG an additional insured under the contractors' policies. (Id., at pp. 24–25). Based upon his experience in the construction industry, it is the practice in the construction industry to rely on certificates of insurance to confirm one's status as an additional insured. (Id., at p. 26).

SMG requested of Columbia and Southern that they defend and indemnify SMG based on its status as an additional insured under the Columbia Policy and Southern Policies. These requests were made in writing on November 19, 1999, December 13, 1999, January 20, 2000, March 20, 2000, and July 5, 2000. (Plaintiff's Statement of Undisputed Facts, ¶¶ 98, 99). These requests referred to and enclosed the relevant Certificates of Insurance issued by Hayes. (Id., at ¶ 100). At the time that Southern and Columbia received the correspondence on behalf of SMG, both Southern and Columbia were in possession of the relevant underlying complaints. (Id., at ¶ 101). In fact, prior to any request by SMG, Southern and Columbia had received requests from Arris for defense of the underlying homeowner lawsuits. (Id., at ¶ 102). Defendants did not respond with an offer of defense, indemnity or contribution to the requests of defense and indemnity by and on behalf of SMG. (Cotter Affidavit, at ¶¶ 5, 7).

On December 18, 2001, the attorneys for SMG met with the attorneys for Arris. (Cotter Affidavit, at ¶ 5). In attendance

were representatives of Southern and Columbia. (Id.). At that time, SMG repeated its request for insurance coverage, specifically requesting that both Southern and Columbia pay to settle the claims for insurance coverage. (Id., at ¶ 6). Southern and Columbia refused to agree to the settlement offer. (Id., at ¶ 7).

On February 8, 2002, the attorney for SMG wrote to both Southern and Columbia, warning them that their refusal to honor their obligations under the applicable policies of insurance would result in SMG and/or its assignees bringing claims for bad faith, attorneys' fees, interest and any other relief. (Plaintiff's Statement of Undisputed Facts, at ¶ 105).

On March 1, 2002, plaintiff Sumitomo brought this suit against defendants Southern and Columbia for declaratory relief and for breach of contract. SMG has expressly assigned to plaintiff all rights to seek contribution and indemnity from defendants, including the right to seek damages for bad faith. (Leskauskas Dep., at pp. 45–46; Plaintiff's Exhibit E).

### *LEGAL DISCUSSION*

Rule 56 of the Federal Rules of Civil Procedure defines the standard for summary judgment: Courts should grant summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of [the record] 'together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Four Parcels of*

*Real Property,* 941 F.2d 1428, 1437–38 (11th Cir.1991).

In meeting this initial responsibility, for issues on which the movant would bear the burden of proof at trial, "that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Four Parcels of Real Property,* 941 F.2d at 1438 (citations and internal quotation marks omitted). For issues on which the non-movant would bear the burden of proof at trial,

> the moving party is not required to support its motion with affidavits or other similar material *negating* the opponent's claim . . . . [T]he moving party simply may show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

*Four Parcels of Real Property,* 941 F.2d at 1438 (citations, footnote and internal quotation marks omitted).

In determining whether the movant has met its burden, the court views the evidence in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 158–59, 90 S.Ct. 1598. Moreover, "[reasonable doubts as to the facts should be resolved in favor of the nonmoving party]," *Borg–Warner Acceptance Corp. v. Davis,* 804 F.2d 1580, 1582 (11th Cir.1986), ". . . and all justifiable inferences are to be drawn in his favor." *Everett v. Napper,* 833 F.2d 1507, 1510 (11th. Cir.1987). The movant's failure to meet this initial burden ends the inquiry and summary judgment should be denied.

However, once the initial burden has been met the "burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark*, 929 F.2d 604, 608 (11th Cir.1991). At this point, "the non-moving party [must] go beyond the pleadings and by affidavits of [his or her] own, or by the 'depositions[,] answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Russ v. International Paper Co.*, 943 F.2d 589, 592 (5th Cir.1991) (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548). *Accord, Four Parcels of Real Property*, 941 F.2d at 1437–38. Denials or allegations by the non-movant in the form of legal conclusions which are unsupported by any specific facts have no probative value, and thus, are insufficient to create issues of material fact that would preclude summary judgment. *Broadway v. City of Montgomery*, 530 F.2d 657, 660 (5th Cir. 1976).[7] Whether facts are material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To avoid summary judgment on issues on which the movant would bear the burden of proof at trial, the non-movant "must come forward with evidence sufficient to call into question the inference created by the movant's evidence on the particular material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993). For issues on which the non-movant would bear the burden of proof at trial and where the movant puts on evidence affirmatively negating the material fact, "the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Id.* at 1116. Finally, for issues on which the non-movant would bear the burden of proof at trial and where the movant demonstrates an absence of evidence on the issue, the non-movant must respond either by "show[ing] that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, ... [or by] com[ing] forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17.

Each of the three parties involved in this case has filed a summary judgment motion. Because they all involve the same issues, the court will discuss them together.

■ Plaintiff asserts that because Dean Hayes had actual authority to create additional insured status, SMG became an additional insured under defendants' policies when Hayes issued the Certificates of Insurance naming SMG an additional insured. Under Georgia law, actual agency arises whenever a person expressly authorizes another to act for him or subsequently ratifies the acts of another made in his behalf. *Stallings v. Sylvania Ford–Mercury, Inc.*, 242 Ga.App. 731, 533 S.E.2d 731, 2000 WL 267108, No. A99A2104 (Ga. App., March 13, 2000). The existence of agency may be proven by showing circumstances, apparent relations, and conduct of the parties. *Id.*; *see also Kinard v. National Indemnity Co.*, 225 Ga.App. 176, 178, 483 S.E.2d 664, 666 (Ga.App.1997).

■ In addition, it is black letter and statutory law in Georgia that a principal is bound by the acts of its agent in the insurance industry. O.C.G.A. § 10–6–51

---

7. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Court of Appeals for the Eleventh Circuit adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

(West 2003); *Patriot General Ins. Co. v. Millis,* 233 Ga.App. 867, 506 S.E.2d 145, 147 (1998). The principal may disagree with the acts of its agent and may find that the acts of its agent exceed the contractual authority it established. Such disagreements, however, are issues that should be addressed between the agent and the principal and not between the agent and the entity that reasonably relied on the agent's representations. *Hutsell v. U.S. Life Title Ins. Co.,* 157 Ga.App. 845, 278 S.E.2d 730, 732–33 (1981) (where it appears by course of conduct that insurer's agent has authority, principal is estopped to deny authority). In fact, even where an insurer revokes the authority of an agent to bind coverage, the insurer will be estopped from denying that agency and the effects of the agent's acts where another relies on an assumption that the agent is properly acting on its authority. *Alexander Underwriters General Agency, Inc. v. Lovett,* 177 Ga.App. 262, 265, 339 S.E.2d 368, 371 (1985).

Here, defendants expressly granted Hayes authority to act as their agent. The Agency Agreement, drafted by Southern and signed by a principal of Banks–Moneyhan–Hayes Insurance Agency, is broad in its scope and allows the agency to, among other things, bind coverage, countersign contracts on behalf of Southern, sign and issue Certificates of Insurance, collect premiums and change existing policies. Specifically, the Southern Agency Agreement states, in part:

> The agent is an independent contractor, not an employee of the Company, and, subject to requirements imposed by law, the terms of the contract, and the underwriting rules and regulations of the Company, is authorized to:
>
> a) Solicit, receive and transmit to the Company proposals for insurance covering such classes of risk as are outlined in the Schedule of Commissions attached and as the Company may from time to time authorize to be insured.

> b) Bind and execute insurance upon such risks, subject to underwriting rules and requirements of the Company as may be stated from time to time.
>
> c) Cancel such contracts of insurance, at the Agent's discretion, where cancellation is legally possible.
>
> d) Provide all usual and customary services of an insurance agent on all insurance contracts placed by the Agent with the Company.
>
> e) Collect and receipt for premiums, and, as full compensation, to retain commissions out of premiums so collected
>
> . . . .

(Plaintiff's Exhibit K). The Agency Agreement between Columbia and Banks–Moneyhan–Hayes contains similar language:

> You are hereby authorized to transact business with us as an independent agent as follows:
>
> A. You are an independent contractor and not an employee of ours. You shall have exclusive control of the conduct of the agency and the selection of companies represented.
>
> B. You may solicit, receive and transmit to us proposals for insurance contracts which are offered by us and for which commission is specified in the attached Commission Schedule(s). You agree to comply with all laws affecting your operations and to maintain valid agent, agency or broker licenses throughout the term of this Agreement.
>
> C. You may bind the kinds of insurance contracts to which this Agreement applies as we, in our sole discretion, may authorize in writing from time to time, and subject to such restrictions as we may establish. You shall not alter, modify, waive or change any provision or condition of our insurance contracts, bonds, rates, underwriting or rating rules or rating plans. You shall mail,

deliver or forward to us copies of all binders, policies, certificates and endorsements issued by you within seven(7) working days of the effective date of such binder, policy, certificate or endorsement.

. . . . .

F. You may countersign insurance contracts, certificates and endorsements, but only for the kinds of insurance specified in the applicable Commission Schedules(s).

G. In accordance with applicable laws, regulations and policy provisions, you may cancel or non-renew any insurance contract placed by you with us and, at your request, we will:

1. Cancel any such insurance contract;

2. Decline to renew any such insurance contract;

3. Give advance written notice of non-renewal to the policyholder under such insurance contract.

We will cancel or non-renew at your request, only if permitted by applicable statutes.

Nothing in the Agreement shall restrict or interfere with our right, for any reason, to cancel or non-renew any insurance contract issued by or through you.

H. You will collect, account, receipt for and pay premiums on business placed with the company by you, as specified in Section II.

I. We may, at our sole discretion, withdraw, limit or otherwise modify your authority to submit new or renewal proposals for any or all kinds of insurance by giving you sixty (60) days written notice, or such longer period, as may be required by applicable statute.

J. Your authority under this Agreement is subject to restrictions imposed by law or regulation and our underwriting rules, regulations and such other instructions, procedures and directives, as we may prescribe or amend from time to time.

(Plaintiff's Exhibit L).

In fact, the authority of Hayes to change existing insurance policies is indicated within the Agreement. Part VI of the Southern Agency Agreement, which discusses termination or suspension of the Agreement, provides:

c) If the Agent is delinquent, in either accounting or payment of monies due the Company, the Company may, by notice to the Agent suspend the Agent's authority to:

(1) Write any new or renewal business.

(2) Change any existing policy during the delinquency period.

(Plaintiff's Exhibit K). Similarly, the Columbia Agency Agreement indicates that Hayes had the authority to modify existing insurance polices:

In the event that:

1. You fail to comply with our underwriting rules, regulations concerning submission of business, or the terms of this Agreement; or

2. You are delinquent in either accounting or payment of any monies due us pursuant to this Agreement; or

3. You have failed in any material respect to comply with the terms of this Agreement.

We may immediately suspend your authority to:

a). Bind coverage or risks;

b). Write any new or renewal business;

c). Change any existing policy and/or;

d). Withhold monies due us by you.

(Plaintiff's Exhibit L).

■ Nothing in the underwriting manuals or other materials supplied to Hayes

expressly restricted Hayes's authority to issue certificates of insurance and create additional insured status. There is no evidence that defendants terminated their respective Agency Agreements, limited Hayes's authority to add entities as additional insureds to an existing insurance policy, or otherwise provided him with notice of any intent to restrict his authority. Thus, pursuant to the express language of the Agency Agreement, Hayes had the actual authority to issue Certificates of Insurance to add an additional insured to an existing insurance policy.

In addition, Hayes's own testimony supports the conclusion that he was defendants' actual agent. Hayes has no relationship with plaintiff, or plaintiff's insured, SMG. Instead, Hayes has an ongoing business relationship with defendants Southern and Columbia. As set forth in detail above, Hayes testified that he had the authority to issue Certificates of Insurance and to create additional insured status. He testified that it was his understanding, consistent with the practice in the insurance industry and in his own practice at the time, that he created additional insured status for SMG by virtue of the Certificate of Insurance. There is no evidence that defendants ever objected to Hayes's issuing Certificates of Insurance to add entities as additional insureds. The first indication that defendants might take issue with Hayes's authority was in this litigation. Prior to answering plaintiff's complaint in this case, defendants never countermanded Hayes's act, suggested that he was not their agent, or argued that he acted outside the scope of his authority. If Hayes lacked specific authority to issue the Certificates, then it was incumbent upon defendants to decline coverage or reserve right and then address the scope of agency with Banks–Moneyhan–Hayes. Defendants did not do so.

 In opposition, defendants argue that Hayes is an agent of Arris, not defendants, because an "independent agent" is typically an agent of the insured, not the insurer.[8] *Kirby v. Northwestern Nat. Cas. Co.,* 213 Ga.App. 673, 445 S.E.2d 791 (1994). Even assuming that is the case, Georgia law also recognizes the concept of dual agency, whereby an agent can act on behalf of both the insured and the insurer. *See Bowen Tree Surgeons, Inc. v. Canal Indemnity Co.,* 264 Ga.App. 520, 591 S.E.2d 415 (2003) (finding that questions of fact regarding the existence of dual agency existed where the agent was able to collect premiums and submit payments to insurance companies from its own account); *Byrne v. Reardon,* 196 Ga.App. 735, 737, 397 S.E.2d 22, 24 (1990) (holding that evidence that agency collected premiums, issued notices of policy expiration and prepared accident notices proved dual agency). The Georgia Court of Appeals has held that an insurer cannot clothe an agent with actual or apparent authority to enter into insurance contracts and then escape the effect of coverage by estoppel simply because the agent is also the agent of the insured party. *Canal Ins. Co. v. Harrison,* 189 Ga.App. 681, 683, 376 S.E.2d 923, 925 (1988). Here, even assuming that Hayes was Arris's agent, for the reasons set forth above, it cannot be disputed that Hayes was also defendants' agent.

8. It is not disputed that Banks–Moneyhan–Hayes Insurance Agency was, at all pertinent times, an independent insurance agency. (Plaintiff's Exhibit 38). Hayes never advertised in defendants' names nor referenced defendants on his business cards or in his sales materials. (Hayes Dep., p. 48). Hayes never used defendants' materials in making sales calls. (Id.).

The undisputed facts show that Hayes had the express and actual authority to issue the Certificates of Insurance, name SMG as an additional insured, and thereby create additional insured status for SMG.

■ Even if Hayes lacked the actual authority to create additional insured status, Hayes acted as an apparent agent of defendants when he issued the Certificates of Insurance naming SMG an additional insured. Where an insurer holds out a person as having the authority to act on its behalf and a third party reasonably relies on that authority, the agent is cloaked with apparent authority. *Kirby v. Northwestern Nat. Cas. Co.,* 213 Ga.App. 673, 678, 445 S.E.2d 791 (1994); *Whitaker v. Zirkle,* 188 Ga.App. 706, 709, 374 S.E.2d 106 (1988). It is not disputed that Hayes signed defendants' insurance policies, declaration pages, and the Certificates of Insurance as an "authorized representative" of defendants. As explained above, defendants expressly provided Hayes with authority, including the power to countersign policies. By virtue of this authorized representation, defendants, as the principles, held out Hayes as their authorized representative and agent for the purpose of issuing the Certificates of Insurance. It is not disputed that Arris believed that Hayes was defendants' authorized representative.

As set forth in detail above, Padget testified that SMG required, as a condition to doing work at the Hamilton Mill Project, that Arris provide it with additional insured status and supply it with the Certificates of Insurance and that SMG relied upon the Certificates of Insurance as proof of insurance. Padget testified further that this reliance was consistent with the practice in the construction industry in general and with the practice of SMG in particular. Padget's testimony is consistent with the testimony of both O'Reilly, a Vice Presi-

dent of Columbia, and Shephard, an underwriter for Southern. O'Reilly testified that an additional insured typically receives a copy of the certificate of insurance, not the underlying policy or endorsement, and that the certificate of insurance provides information to an interested third party as to its status as an additional insured. (O'Reilly Dep., at pp. 69, 70). Shephard testified that it is normal practice in the construction industry for an insured to rely upon certificates of insurance rather than actual policies of insurance. (Shephard Dep., at p. 41). In fact, Shephard specifically stated that Southern relied on certificates of insurance as proof of insurance. (Shephard Dep., at p. 85).

The admitted, undisputed facts establish that SMG reasonably relied upon the Certificates of Insurance as a representation that SMG was an additional insured under defendants' policies. Hayes, therefore, was cloaked with apparent authority, if not actual authority. *See Southeastern Express Systems, Inc. v. Southern Guaranty Ins. Co. of Georgia,* 224 Ga.App. 697, 700, 482 S.E.2d 433, 435 (1997) (holding that, where an insurance policy is stamped with instructions to contact an independent agent for claims, the independent agent will be given apparent authority, and the insurer will be estopped from denying agency).

In opposition, defendants assert that their contracts of insurance required that additional insureds be added only by endorsement. Defendants insist that they never received a request to add SMG to their policies, that they never received copies of the Certificates of Insurance adding SMG and that Arris never requested that SMG be added to the Policies as an additional insured. No endorsement was ever issued by defendants.

■ Under Georgia law, the knowledge of an agent is imputed to the principal.

*Graphic Arts Mutual Ins. Co. v. Pritchett,* 220 Ga.App. 430, 431, 469 S.E.2d 199, 201 (1995); *Dawes Mining Co., Inc. v. Callahan,* 246 Ga. 531, 534, 272 S.E.2d 267, 270 (1980); O.C.G.A. § 10–6–58 (2004). Defendants, through the acts of their agent, had knowledge of the Certificates of Insurance. This is true even if defendants did not actually receive copies of the Certificates, which would contradict Hayes's unrebutted testimony that his agency, as a matter of practice, would have sent a copy of the Certificates to defendants. Defendants had actual knowledge of the Certificates of Insurance no later than November of 1999, when they received the requests for insurance coverage from SMG's attorney, which correspondence included a copy of the Certificates of Insurance. Defendants took no action to countermand Hayes's authority, reserve rights, or otherwise challenge the Certificates of Insurance until this lawsuit was filed against them. Thus, defendants had both constructive and actual knowledge of the Certificates of Insurance, and are bound by the terms of those Certificates of Insurance. This is true even if Hayes exceeded his authority by not obtaining the endorsements from defendants. *See Alexander Underwriters General Agency, Inc.,* 177 Ga.App. at 265, 339 S.E.2d at 371.

"In Georgia, insurance policies are governed by ordinary rules of contract construction." *United States Fidelity & Guaranty Co. v. Park 'N Go of Georgia, Inc.,* 66 F.3d 273, 276 (11th Cir.1995). In other words, "[t]he rules of contract interpretation are statutory, and construction of a contract is a question of law for the court." *Id.* Moreover, "[u]nder Georgia rules of contract interpretation, words in a contract generally bear their usual and common meaning." *Bituminous Casualty Corporation v. Advanced Adhesive Technology, Inc.,* 73 F.3d 335, 337 (11th Cir. 1996). The Certificates of Insurance expressly included SMG as an "additional insured" under defendants' policies.

■ Defendants contend that their insurance policies, by their own terms, restrict modification, including adding an additional insured. According to underwriting custom and practice, as testified to by Malecki, when an entity is simply added as an additional insured under a liability policy, the coverage is neither expanded nor reduced. Malecki stated: "The policy terms and conditions remain unchanged. The way the policy is then read is that wherever the term 'insured' appears in the policy, it is substituted by the name of the additional insured." (Malecki Affidavit and Report, at p. 8). Defendants have admitted that they did not endorse or amend their policies of insurance. (Plaintiff's Statement of Undisputed Facts, ¶ 93).

■ In addition, the clause of the policies upon which defendants rely for their argument that the policies cannot be amended is known as the "entire contract clause":

> This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. The policy terms can be amended or waived only by endorsement issued by us and made a part of this policy.

(Plaintiff's Exhibit 48, Common Policy Condition B). It specifically addresses the fact that "you," the Named Insured, Arris, cannot unilaterally amend or waive the terms of the policy. The "entire contract clauses" do not address the authority of defendants' agent or the relationship between defendants and additional insureds. Thus, there is nothing contained within the clauses that would expressly restrict the

naming of additional insureds under a general contractor's policy.

Defendants then point out that the Certificates of Insurance also expressly included a disclaimer that they are for information purposes only and do not amend the respective policies of insurance. The parties have not submitted any binding authority squarely on point.

In *Mountain Fuel Supply v. Reliance Ins. Co.*, 933 F.2d 882, 889 (10th Cir.1981), the Tenth Circuit Court of Appeals held that where there is an affirmative manifestation of intent to incorporate the certificate of insurance (adding an insured) into an insurer's policy, the third party becomes a named insured by virtue of the certificate even though the certificate contains a disclaimer. That court found that there was a manifestation of intent that the certificate be incorporated within the policy because, in part, the agent who countersigned the certificate was the agent of the insurance company. That Court, however, held that the specific terms of the policy remained in force as originally written, and thus the third party's status as named insured expired when the underlying policy expired. *See also American Country Ins. Co. v. Kraemer Bro's, Inc.*,

298 Ill.App.3d 805, 232 Ill.Dec. 871, 699 N.E.2d 1056 (1st Dist.1998) (holding that the additional insured was required to look to the policy to determine the extent of coverage and any exclusions because the certificate of insurance contained disclaimer language); *Employers Mutual of Wausau v. U.S. Fire Ins. Co.*, No. 1–01–3426 (Ill.App.1st Dist.2002).[9]

▬ Accordingly, in this case, Hayes, defendants' authorized agent, by issuing the Certificate of Insurance and naming SMG as an additional insured, manifested the intent to incorporate the Certificates of Insurance into defendants' policies.[10] Thus, SMG was made an additional insured under defendants' policies with coverage to the extent of the policies as they existed at that time. *Accord Dumenric v. Union Oil Co. of California*, 238 Ill.App.3d 208, 179 Ill.Dec. 398, 606 N.E.2d 230 (1st Dist.1992) (holding that the principal, having created the authority, is estopped to deny it to the detriment of a third party); *see also Strain Poultry Farms, Inc. v. American Southern Ins. Co.*, 128 Ga.App. 600, 600, 197 S.E.2d 498 (1973) (holding that "the insurer ... is estopped by its pleadings ... and its certificate of insurance to contend that [additional insured] is

---

9. In *Employers Mutual of Wausau*, which involved a certificate of insurance with a disclaimer similar to the one in this case, the Illinois Appellate Court held:

> In deciding to what extent coverage is available, we believe it makes sense to have to look to the policy when the certificate of insurance contains disclaimer language. However, when a certificate of insurance issued by the insurer's representative clearly states that an entity is an additional insured, it makes little sense for that entity to have to scour the policy to ensure that is in fact an additional insured, regardless of the disclaimer language. After all, what is a certificate of insurance for if not to verify that a named part is in fact insured?

*Employers Mutual of Wausau v. U.S. Fire Ins. Co.*, No. 1–01–3426 (Ill.App.1st Dist.2002).

10. This case is clearly distinguishable from *Wilder v. Jefferson Insurance Company of New York*, 252 Ga.App. 563, 566–7, 555 S.E.2d 771 (2001), where the Court held that "[a]n application for insurance creates no binding contract of insurance until the insurer manifests its acceptance [and that n]either an insurer's silence in response to an application nor its delay in passing upon an application, has the effect of creating a contract of insurance, even when the insured has forgone seeking other insurance." Unlike in this case, the insurance agent in *Wilder*, who issued the certificate of insurance, was the insured's agent only, not the insurer's agent, and had no authority to bind the insurer to a contract of insurance.

not a named insured, or not insured, under the policy, as against the insurer's contention that the certificate of insurance was not binding because it was not attached to the policy as an endorsement thereon.").

 Based on the Certificates of Insurance, SMG made elections of coverage under defendants' policies by repeatedly requesting that defendants defend and indemnify SMG in the underlying homeowner lawsuits.[11] If the facts as alleged in a complaint tendered to an insurer even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend the action. *City of Atlanta v. St. Paul Fire and Marine Ins. Co.*, 231 Ga.App. 206, 207, 498 S.E.2d 782, 784 (1998). Furthermore, if the claims alleged are actually covered by the policies, the insurer had a duty to indemnify the insured. *Id.* It is undisputed that the Southern and Columbia Policies provided coverage for Arris in the underlying homeowner lawsuits. The allegations against SMG in the underlying homeowner lawsuits were similar in all material respect to the allegations made against Arris. As a result, coverage, including defense and indemnity, should have been provided to SMG. Defendants breached their duty to defend and indemnify SMG for the underlying homeowner lawsuits as a matter of law. Any dispute as to whether Hayes exceeded his authority should have been resolved between Hayes and defendants, not between defendants and SMG or its insurer, Sumitomo.

Southern next contends that even if the Certificates of Insurance created additional insured status, plaintiff could not recover in the cases that have already been adjudicated in which Arris was found not liable because Southern would have endorsed its policy to restrict such coverage had it received the request to add SMG as an additional insured. Though Southern has admitted that it did not issue any endorsement in connection with SMG, it contends that it would have issued an endorsement under which SMG would have been insured "only with respect to liability arising out of [Arris's] ongoing operations performed for [SMG]." Such an endorsement, however, was never made a part of the policies and never introduced as evidence in this lawsuit. Southern provides no authority or support for its contention that its policies should be amended after the fact to include language that would reduce the coverage granted to SMG. Southern did not challenge SMG's status, or otherwise attempt to limit coverage even after it had actual knowledge of the Certificates of Insurance. In the absence of this fictional endorsement, SMG, as an additional insured under defendants' policies, enjoys the same rights under defendants' policies as Arris. Therefore, the liability or non-liability of Arris in the underlying homeowner lawsuits [12] is irrelevant to the fact that SMG was an additional insured under the policies and entitled to the same benefits of coverage that were granted to Arris.

 Defendants next assert that plaintiff cannot bring a bad faith claim against them. Under Georgia law, a claim

---

**11.** Contrary to Southern's argument, SMG's attorney, and not plaintiff, sought information from Southern. See Plaintiff's Exhibits Q and R.

**12.** Arris was deemed not liable in one of the underlying homeowner lawsuits. The court notes that, regardless of the verdict in one lawsuit, Southern had a duty to defend SMG, which duty it breached. In addition, it is undisputed that Southern settled the other underlying homeowner lawsuits on behalf of Arris. Thus the finding of no liability in one case cannot be extended to all the underlying homeowner lawsuits.

for statutory penalties for bad faith cannot be made by anyone other than the insured. *Southern General Insurance Company v. Ross,* 227 Ga.App. 191, 489 S.E.2d 53 (1997). Plaintiff is not an insured under defendants' policies. However, common law bad faith claims are assignable under Georgia law. *Id.,* at 196, 489 S.E.2d 53. SMG, defendants' additional insured, properly assigned its right to bring a common law claim for bad faith to plaintiff. Plaintiff alleges that defendants acted in bad faith because they refused to even respond to repeated tenders of defense by SMG based on their erroneous contentions that their own agent had no authority to create additional insured status. Defendants deny this and state that they responded by denying that they were required to provide the requested defense. "[A] proper and safe course of action for an insurer in this position is to enter upon a defense under a reservation of rights and then proceed to seek a declaratory judgment in its favor." *Alexander Underwriters General Agency, Inc.,* 177 Ga.App. at 266, 339 S.E.2d at 372. However, there exists a genuine issue of material fact as to precise nature of defendants' conduct in this regard and, thus, there is a jury issue as to whether such conduct constituted bad faith.

In their counterclaim, defendants argue that Arris was a "real estate manager" for SMG and therefore entitled to insured status under plaintiff's policies. SMG hired Arris to perform infrastructure work on the Hamilton Mill Project. This work included clearing, grubbing and erosion control work, as well as development of streets and lots. (Padget Dep., at p. 10). Defendants do not dispute that Arris was not involved in the building, selling, renting or advertising of any homes or any other structures. (Hill Dep., at p. 17). Arris was directed to hire and manage subcontractors for the purpose of construction work. Arris was a construction manager on the Hamilton Mill Project. (Hill Dep., at p. 19).

Hayes, defendants' authorized agent, who has had a long-standing business relationship with Arris as its agent, testified that it was his understanding that a "real estate manager," is an entity that manages apartments, multiple use facilities, and things of that nature. (Hayes Dep., at p. 152). Furthermore, Malecki testified in his Affidavit and Report that the term "real estate manager" in standard general liability policies was never intended to cover construction managers or general contractors but was, instead, included in policies to cover property owners and their landlords, thereby avoiding the need to purchase separate policies of insurance for every parcel owned. The term is meant to cover those who rent, maintain rental premises, keep the books and kindred duties for property owners. (Malecki Affidavit and Report, at pp. 9–10).

Defendants' own representatives have provided testimony that demonstrates that Arris would not be considered a "real estate manager" pursuant to defendants' practice. Larry Criswell, Southern's claims manager, testified that the only situations he could recall where Southern had defended an entity based on the term "real estate manager," would be "if our insured was trying to sell a piece of property and they had it listed with the real estate agent or they had a piece of property that a particular company may manage the property for them . . . ." (Criswell Dep., at p. 53). In addition, Criswell never handled any claim where the insured qualified as a real estate manager but was not involved in the sale or rent of property. (Id.). David Hubbard, Columbia's representative with respect to claims handling, testified that the only situations he could recall where an entity had been

granted coverage as a real estate manager was where that entity supervised properties, such as collecting rents and doing maintenance. (Hubbard Dep., at p. 27).

Defendants' understanding of the term "real estate manager" also is consistent with the understanding of Padget, the Vice President of Construction Development for SMG, who testified that a "real estate manager" is a person who manages someone's assets with regard to collection of rents, paying utilities, or dealing with associations or the advertising and marketing of the property. (Padget Dep., at p. 19).

In *Hartford Ins. Co. of the Southeast v. State Farm Fire & Casualty Co.,* 630 So.2d 652 (1994), the court held that a construction manager was a "real estate manager." The construction manager in that case, however, also had a contract to manage and oversee the entire operation, including the sale of homes. Unlike the construction manager in *Hartford,* Arris had no role in the day-to-day management of existing homes, had no role in renting or selling homes, and was not involved in the hiring, training and management of sales personnel or the establishment of budgets for operating a venture whose purpose was to sell real estate. Arris's role relative to the Hamilton Mill Project cannot be characterized as a real estate manager because Arris did not participate in sales, the collection of rents, or other associated duties.

Moreover, Arris neither elected for nor requested coverage under plaintiff's policies. Defendants are claiming coverage for the first time years after resolution of the underlying cases, making their claim on behalf of Arris stale. It is not disputed that Arris never bargained, negotiated, or paid for any of plaintiff's policies.

■■■■■■ Defendants argue that the term "real estate manager" in plaintiff's policies is ambiguous [13] and therefore must

13. To support their argument, defendants rely on the testimony of Gayle Hill, the president of Arris. Contrary to defendants' contention, however, Hill's testimony, as set forth below, does not indicate his understanding that he acted as the "real estate manager" for the Hamilton Mill Project:

Q: Let's talk a little bit about real estate management. You were asked a few moments ago about whether you did any real estate management out at the Hamilton Mill project. Did you manage the work on the real estate, that is the undeveloped land of the project, before and during the Hamilton Mill development?
A: Yes.
Q: And so you were in real estate development on this project, weren't you:
Mr. Marshall: Objection to form and foundation.
A: That is what people say I do for a living, some people say I do for a living.
Q: And you managed the people that actually moved the dirt; is that correct?
A: Yes, sir.
Q: And it was the dirt that the plaintiffs in the underlying lawsuit said ran into the creek that ran behind their properties; is that correct?
A: Well, depends on what lawsuit you're talking about. They had different—but some of them, yes.
Q: And you on behalf of SMG helped direct the water through the waterways; is that correct?
A: We installed the systems that were designed by the engineer.
Q: And it was the water running off the real property, the real estate, the land and it was the silt, which was the land itself or the real property that the plaintiffs in the underlying lawsuit said caused them damage; is that correct?
A: Two of the seven, I think that would be appropriate; but I think five of them was the increased water flow is what their concern was.
Q: And the water flowed off of what:
A: Off of the property which we were developing.
Q: Which is real estate; is that correct?
A: Which is real estate.
Q: And you managed the development of that real estate in the Hamilton Mill project?

be construed against plaintiff. Merely because the parties disagree as to the definition of a term in a contract does not make the term ambiguous. As set forth above, the case law and industry custom adequately define the term at issue. Plaintiff states that the term "real estate manager" has been used in the industry as part of every general liability policy that has been written in this country since 1955. *Commercial General Liability Insurance,* IRMI, Vol. I, p. V.H.9 (2002). It is not reasonable, or possible, to require an insurer to define every term in an insurance policy so that no disagreements would arise. Thus, this counterclaim fails as a matter of law.

■ With respect to Southern's counterclaim alleging that plaintiff should be held liable for SMG's alleged breach of contract to indemnify Arris, Southern has no standing to bring such a claim. It is not disputed that Arris is not a party to this case, and there is no indication that Southern ever obtained any assignment of rights from Arris. In addition, it cannot be disputed that SMG is not a party to this case. The fact that SMG assigned rights of recovery to plaintiff under defendants' insurance contracts does not create liability of plaintiff for SMG's obligations in its contracts with Arris. The parties have not submitted any authority that would support this court's allowing Southern or Columbia to claim that Sumitomo is liable for any alleged breach of contract between SMG and Arris. Therefore, Southern's counterclaim fails as a matter of law.

Therefore, the court hereby GRANTS in part and DENIES in part, as set forth above, plaintiff's motion for summary judgment on its claims and on defendants' counterclaims [14] and DENIES defendants' respective motions for summary judgment.[15]

## *CONCLUSION*

In sum, the court hereby 1) GRANTS plaintiff's motion for summary judgment with respect to defendants' counterclaims [# 63]; 2) GRANTS in part and DENIES in part, as set forth above, plaintiff's motion for summary judgment with respect to plaintiff's first amended complaint [# 64]; 3) DENIES defendant Southern Guaranty Insurance Company of Georgia's motion for summary judgment [# 65]; and 4) DENIES defendant Columbia National Insurance Company's motion for summary judgment [# 66].

---

A: Yes.

Q: Did you know that Sumitomo's policy said that real estate managers or real estate managers are covered under their policy?

Mr. Marshall: Objection to representations about what the policy says out of context. Objection to form, foundation.

Q: Did you know that?

A: I'll take your word for it.

(Hill Dep., at pp. 67–69). This testimony clearly indicates Arris hired subcontractors to move dirt and install infrastructure, similar to any general contractor. Arris did not advertise, sell, manage or build any homes, dwellings or office buildings on the Hamilton Mill Project. Arris, therefore, was not a "real estate manager" as that term is understood in the insurance and construction industries.

14. With respect to their allegation that plaintiff interfered with contractual relationships between Arris and SMG, defendants have not set forth any facts or evidence to support their allegations. Therefore, the court hereby DISMISSES these allegations.

15. Southern also argues that this court should dismiss plaintiff's request for declaratory relief because this case does not fall within the ambit of a Declaratory Judgment Act. As all of the essential issues and claims sought by plaintiff have been resolved in connection with plaintiff's action for breach, this court need not address the declaratory relief claim.

In their Preliminary Report to the court, the parties reserved the issue of damages, including the right to conduct discovery and present evidence, for a time period to be determined, after this court decided the coverage issues on motions for summary judgment. Accordingly, the parties are hereby ALLOWED to conduct additional discovery, if necessary, and submit a pre-trial order within 90 days of the date of the entry of this order on all issues still remaining in this case.