Self, Judge.
*729 Ronald Lee appeals from the trial court's order granting Mercury Insurance Company of Georgia's ("Mercury") motion for summary judgment and denying his cross-motion for summary judgment on the issue of insurance coverage following a house fire. Lee contends that the trial court erred by concluding that the policy did not provide coverage as a matter of law, asserting that the trial court should have instead concluded that he was entitled to summary judgment in his favor for breach of the insurance contract and the right to recover bad faith damages under OCGA § 33-4-6.[1] He also asserts that genuine issues of material fact exist regarding Mercury's claim that it is entitled to void the policy based upon alleged misrepresentations in his application for insurance. Finally, he argues that the trial court erred in denying his motion to strike the affidavit of Mercury's director of underwriting, as well as *121 denying his motion to compel production of Mercury's claim file.
For the reasons explained below, we reverse the trial court's grant of summary judgment in favor of Mercury with regard to all issues other than bad faith, grant Lee's motion for summary judgment on the issue of coverage under the policy, and affirm the trial court's denial of Lee's motion to strike and motion to compel. Based upon our conclusion that genuine issues of material fact exist with regard to whether Mercury is entitled to void the policy, Lee cannot yet obtain a recovery under the policy.
"On appeal, we review the grant or denial of summary judgment de novo, construing the evidence and all inferences in a light most favorable to the nonmoving party." (Citation and punctuation omitted.) Seki v. Groupon, Inc., 333 Ga. App. 319, 775 S.E.2d 776 (2015). So viewed, the record shows that Lee lived with his wife in South Carolina, but traveled frequently as a senior project manager for a company constructing public housing developments. He typically traveled during the week and was home in South Carolina on the weekends. He explained that most projects would take 10-12 months to complete.
In 2007, Lee frequently traveled between two projects: one in Winder, Georgia, and the other in Crestview, Florida. During this *730 time, Lee's childhood friend, Jim Constable, faced significant financial difficulties because he was caring for his wife, who suffered from a long-term terminal illness, and unable to work. To help his friend, Lee agreed to purchase Constable's home at 7066 Dalmatia Drive in Riverdale, Georgia, pay the mortgage payments, and allow Constable's family to continue living there for free. This arrangement "gave [Lee] a place to stop, plus it helps [Constable] and his family, and [Lee didn't] have to rent motel rooms." Lee explained that he "was traveling constantly, flying through Atlanta. And I'd just stop in there ... and then go catch another flight the next day."
In December 2007, Lee purchased the Riverdale house from Constable, and Constable's family continued living on the property. It is undisputed that Constable paid no rent. As part of their arrangement, Constable gave Lee all of the furniture in the bedroom, living room, kitchen, and dining room. Lee wanted the option to rent the house in the event Constable's money problems deteriorated to the point where he had to move out and live with other family members. When Lee first took out the loan in 2007, he stayed at the Riverdale house so many nights each week, his mortgage company considered it his primary residence. Later, he stayed there "maybe one night a week, every other week, or something."
In 2010, Lee made a claim with a different insurance carrier for hail damage to the Riverdale house. After telling Constable that this carrier planned to increase his premiums as a result of the claim, Constable stated that his friend, Lawrence Arnold, was an insurance agent who could obtain insurance for the house. In his deposition, Lee explained that he talked with Arnold over the telephone to provide him with the information required to complete the application. Because he was not there to sign the application, Lee asked if Constable could sign his name, and Arnold replied, "yes, that's fine." According to Lee, Arnold knew that he would not be living there full-time; Lee told him that he would "be stopping in ... because I travel." Lee also testified that Arnold never asked him if he would be living there, because Arnold "knew [Constable] was living there" based upon Arnold's friendship with Constable.
All of the answers in Lee's application for insurance were typed, consistent with Lee's testimony that he did not personally complete the application. In one section of the application, the directions state, "Check all that apply," and an "X" is typed in the boxes beside "Primary" and "Occupied by Named Insured"; the boxes beside "Secondary" and "Additional Residence for Insured" are left blank. This section does not include a box identifying the property as rental property. Another section of the policy directs that all residents of the household be listed, including unrelated individuals. Lee's name, *731 followed by the abbreviation "IN," along with his friend, Jim Constable, and Constable's two children, followed by the abbreviation *122 "OR," meaning "other" are typed into a column titled "Rel. to Ins."
On May 5, 2012, the property was destroyed by an accidental fire in which Constable died and one of his daughters suffered serious injuries. After receiving a letter denying his claim for coverage under the policy in December 2012, Lee filed a complaint against Mercury and Arnold alleging various theories of recovery. He later dismissed his claim against Arnold with prejudice.
During discovery, Lee filed a motion to compel Mercury to produce documents in its claim file. Mercury responded that it had already produced many of the requested documents, as well as a privilege log detailing its attorney-client privilege and work product objections to Lee's remaining requests. The trial court held a hearing, inspected the documents in camera, and then granted Lee's motion in part, but denied it as to documents it determined were protected by attorney-client privilege and the work product doctrine.
Following the completion of discovery, Mercury filed a motion for summary judgment in its favor based upon (1) the misrepresentation in the policy application that the Riverdale house was Lee's primary residence and (2) Lee's failure to reside at the Riverdale house as required by the terms of the policy. Lee filed a response, a cross motion for summary judgment, and a motion to strike the affidavit of Mercury's director of underwriting, which Mercury filed in support of its motion for summary judgment. Lee asserted that he was entitled to summary judgment in his favor on the issue of coverage under the terms of the policy and Mercury's bad faith. Following a hearing, the trial court granted Mercury's motion for summary judgment and denied both Lee's cross-motion for summary judgment and his motion to strike.
1. Coverage Under the Policy. Lee asserts that the trial court should have granted summary judgment in his favor "as there is sufficient evidence in the record to support a finding of breach of contract."[2] In his view, the policy provisions expressly cover the loss *732 of the Riverdale house due to fire, and this home qualified for coverage under the policy terms. We agree.
Under Georgia law,
[i]t is well settled that insurance policies, even when ambiguous, are to be construed by the court, and no jury question is presented unless an ambiguity remains after application of the applicable rules of contract construction. Because insurance policies are contracts of adhesion, drawn by the legal draftsman of the insurer, they are to be construed as reasonably understood by an insured.
(Citation and punctuation omitted.) First Financial Ins. Co. v. American Sandblasting Co., 223 Ga. App. 232 (1), 477 S.E.2d 390 (1996). "The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." Cincinnati Ins. Co. v. Davis, 153 Ga. App. 291, 295, 265 S.E.2d 102 (1980). "The insurer, in preparing the language of its policy, has the burden of using language that is clear and precise." Ga. Farm Bureau Mut. Ins. Co. v. Meyers, 249 Ga. App. 322, 324, 548 S.E.2d 67 (2001). "The test is not what the *123 insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean." (Citation and punctuation omitted.) United States Fire Ins. Co. v. Capital Ford Truck Sales, 257 Ga. 77, 78 (1), 355 S.E.2d 428 (1987).
"[I]f a provision of an insurance contract is susceptible of two or more constructions, even when the multiple constructions are all logical and reasonable, it is ambiguous, and the statutory rules of contract construction will be applied." (Citation and punctuation omitted.) American Strategic Ins. Corp. v. Helm, 327 Ga. App. 482, 485, 759 S.E.2d 563 (2014). When a provision of an insurance contract is ambiguous, a well-known rule of construction is that it will be "construed against the party preparing it and in favor of coverage." (Citation and punctuation omitted.) Fireman's Fund Ins. Co. v. Univ. of Ga. Athletic Assn., 288 Ga. App. 355, 357, 654 S.E.2d 207 (2007). "Ambiguity in an insurance policy may [also] be defined as duplicity, indistinctness, an uncertainty of meaning or expression."
*733 (Citation and punctuation omitted.) Alley v. Great American Ins. Co., 160 Ga. App. 597, 599, 287 S.E.2d 613 (1981).
The "COVERAGE A-DWELLING"[3] portion of Lee's policy with Mercury states:
We cover:
the dwelling on the residence premises shown in the Declarations used principally as a private residence, including structures attached to the dwelling; materials and supplies located on the residence premises used to construct, alter or repair the dwelling or other structures on the residence premises.... (Emphasis in original.)
The policy defines "residence premises" as follows:
"Residence premises" means the one, two, three or four family dwelling, condominium or rental unit, other than structures and grounds, used principally as a private residence; where you reside and which is shown in the Declarations. (Emphasis in original.)
The policy does not define the term "reside." And nowhere in the policy is there a reference to a "primary residence" or "secondary residence," much less a definition of these terms.[4] And unlike other insurance policies, it did not include an express condition requiring the insured to reside only at the residence *734 premises. Compare Ga. Farm Bureau Mut. Ins. Co. v. Kephart, 211 Ga. App. 423, 424 (1) (a), 439 S.E.2d 682 (1993) (physical precedent only).
Based upon the placement of the semicolon in the definition of "residence premises," a layperson could reasonably understand the defined term to mean "the one, two, three or *124 four family dwelling condominium or rental unit, other than structures and grounds, used principally as a private residence" or"where you reside and which is shown in the Declarations."[5] "Punctuation is an important indicator of meaning." Hill v. Nationwide Mut. Fire Ins. Co., 214 Ga. App. 715, 717, 448 S.E.2d 747 (1994). "The semicolon is normally employed in marking off a series of sentences or clauses of coordinate value, that is, to separate consecutive phrases or clauses which are independent of each other grammatically, but dependent alike on some word preceding or following." (Citation omitted.) Springtime, Inc. v. Douglas County, 228 Ga. 753, 755 (1), 187 S.E.2d 874 (1972). In this case, the definition of "residence premises" could be read by a layperson as having two separate, consecutive clauses (definitions) dependent alike upon the preceding word "means."
In Georgia Intl. Life Ins. Co. v. Bear's Den, 162 Ga. App. 833, 835 (1), 292 S.E.2d 502 (1982), we addressed ambiguity in an insurance policy caused by the lack of an "and" or an "or" after a comma in policy language defining when the policy became effective. In that case, the insurer asserted that the connective "and" should be inserted after a comma to create three conditions for the policy to become effective, while the insured asserted that the comma separating the first two conditions from the third should be construed as the disjunctive "or." Id. at 834, 292 S.E.2d 502. We held:
Because neither an "and" nor an "or" appears in the provision in question in the instant case, it is not possible to determine from the provision itself whether the conditions to enforceability stated therein are disjunctive or conjunctive.
*735 Either construction would be viable. Thus, the provision in the instant case, containing neither a conjunctive nor a disjunctive connective, is inherently ambiguous.[6]
(Citation omitted.) Id. at 835, 292 S.E.2d 502. We are persuaded by this reasoning to reach the same conclusion in this case.[7]
The dissent states that "the plain language" of the policy "provides that it covers the residence premises and defines such as a private residence where the insured resides." In order to reach this result, however, the dissent must rewrite the policy by removing the semicolon. This we cannot do. "It is the duty of the courts to construe and enforce contracts as made, and not to make them for the parties. The law will not make a contract for the parties which is different from the contract which was executed by them." (Citations and punctuation omitted.) Perkins Hardwood Lumber Co. v. Bituminous Cas. Corp., 190 Ga. App. 231, 232 (1), 378 S.E.2d 407 (1989). See also *125 Moore v. Continental Cas. Co., 252 Conn. 405, 746 A.2d 1252, 1256 (2000) ("We cannot rewrite the insurance policy by adding semicolons any more than we can by adding words.").
The dissent's proposed construction of the policy also conflicts with Mercury's internal practices. Kevin Bailey, the director of underwriting for Mercury Insurance Group, testified that Mercury "use[s] the same policy contract for primary or secondary dwelling[s]." But the dissent would require an insured to reside, meaning "dwell permanently or for some considerable time ... in or at a particular place," in order to obtain coverage under the policy. Under this interpretation, a secondary residence, such as a beach or mountain *736 home, would be not be covered under the policy form, even though it is undisputed that Mercury used the same policy form to insure secondary residences. Lemieux v. Blue Cross & Blue Shield of Ga., 216 Ga. App. 230, 231, 453 S.E.2d 749 (1994) ("where the contract is ambiguous or open to interpretation, 'all the attendant and surrounding circumstances' must be considered to discover the parties' intention").[8] Reading the definition of "residence premises" to provide an alternative definition as outlined above would provide coverage for secondary residences, consistent with the underwriter's testimony, and prevent future litigation over illusory and worthless policies issued by Mercury for secondary residences. See Isdoll v. Scottsdale Ins. Co., 219 Ga. App. 516, 518 (1), 466 S.E.2d 48 (1995) (rejecting construction of policy that would make coverage afforded by policy illusory). We should avoid a construction that would "hoodwink" insurance purchasers and make a nullity of coverage. United State Fire Ins. Co. v. Hilde, 172 Ga. App. 161, 163 (2), 322 S.E.2d 285 (1984). If Mercury had intended for this policy form to cover only primary residences of an insured, it could have easily done so by using the word "your" in place of "a" in its statement of coverage." The policy would have then read: "We cover the dwelling on the residence premises shown in the Declarations used principally as [your] private residence...." Mercury's failure to do so is consistent with Mercury's use of this policy form, as testified to by its own director of underwriting, to insure both primary and secondary residences.
To support the claim that we should read the semicolon out of the policy, the dissent cites cases relying upon an anachronistic view of punctuation that are also factually distinguishable. See Ewing's Lessee v. Burnet, 36 U.S. 41, 54, 11 Pet. 41, 9 L.Ed. 624 (1837) ; Bridges v. Home Guano Co., 33 Ga. App. 305, 311, 125 S.E. 872 (1924). In Bridges, a case not involving the construction of an insurance policy, we cited the Century Dictionary[9] as " 'tell[ing] us, what is common knowledge, that "there is still much uncertainty and arbitrariness in punctuation." ' " Id. at 311, 125 S.E. 872. We also cited law dating back to 1837.[10] In their treatise on the proper interpretation of legal texts, Justice Scalia and Professor Garner explain why this historic bias against *737 punctuation exists and should no longer be continued in modern times:
No helpful aid to interpretation has historically received such dismissive treatment from the courts as punctuation-periods, semicolons, commas, parentheses, apostrophes. The original reason was understandable enough. Punctuation was considered of small account because it was thought to be "the work of the engrossing clerk or the printer." And again, in the days of yore, it was held that because many legislators voted only on the basis of bills that they heard read aloud-without seeing the printed page-they could take no notice of the punctuation marks....[11]
*126 Commentators have often said that "punctuation is never permitted to control, vary, or modify the plain and clear meaning of the language of the body of the act." This must be a remnant of the former denigration of punctuation that had not been adopted by the legislature; in modern times, we see no rational basis for such a rule. As is the case with other indicators of meaning, the body of a legal instrument cannot be found to have a "clear meaning" without taking account of its punctuation. There is no reason to exclude punctuation from this stage of the inquiry. And we disagree with the position that the use of punctuation as an interpretive aid should be relied on only "when all other means fail."
Punctuation is often integral to the sense of written language.
(Punctuation and footnotes omitted.) Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 161-162 (1st ed. 2012). For example, "[p]eriods and semicolons insulate words from grammatical implications that would otherwise be created by the words that precede or follow them...." Id. at 162. See also In re Hawker Beechcraft, 515 B.R. 416, 424 (S.D.N.Y. 2014) ("Punctuation in a legal text will rarely change the meaning of a word, *738 but it will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part.") (citation and punctuation omitted). Since the publication of this treatise, other courts have cited its view of punctuation favorably. See Navajo Nation v. United States Dept. of the Interior, 819 F.3d 1084, 1093 (9th Cir. 2016) ("Punctuation is a permissible indicator of meaning.") (citation and punctuation omitted); Maple Drive Farms v. Vilsack, 781 F.3d 837, 847 (II) (A) (6th Cir. 2015) ("No intelligent construction of a text can ignore its punctuation.") (Citation and punctuation omitted); In re Hawker Beechcraft, supra.
Moreover, the Bridges case does not require a different result here. Instead, it should be viewed as appropriately applying the exception to the maxim that the rules of grammatical construction usually govern unless they are contrary to the intent of the parties. See OCGA § 13-2-2 (6).[12] In that case, the contract provision at issue stated: " 'In case of destruction of our mills, in whole or in part, or stoppage by strikes or other causes, we reserve the right to cancel all or any part of this contract; and the company reserves the right to ship all or part of this contract as they may deem expedient.' " 33 Ga. App. at 305, 125 S.E. 872. The defendant drafted the clause and contended that the clause after the semicolon should "be considered independently of the preceding part of the sentence, and thus as attaching an unconditional reservation of the right to ship only such part of the fertilizers as it might deem expedient." Id. at 308, 125 S.E. 872. After examining other provisions in the contract, we concluded that the defendant's interpretation of the contract would render other provisions in the contract "wholly superfluous" and read "the right to ship all or part" of the order as dependent upon the previously stated conditions. Id. at 310-311, 125 S.E. 872.
We expressly recognized, however, that
[i]t might be possible for a case to arise in which all other considerations were evenly balanced and that the difference between these marks of punctuation might, like a feather's weight, turn the scale to one side rather than the other; but this is not a case of that character. The punctuation of an *739 instrument may be considered when the meaning is doubtful, but it can not control if the meaning otherwise plainly appears.
*127 (Citations and punctuation omitted.) Id. As this is not a case in which an intent contrary to the punctuation used by the insurance company in drafting the policy plainly appears, we cannot ignore the semicolon.
In sum, it has long been settled that even
if, notwithstanding the arrangement of the clauses in the sentence and the punctuation of the same, the words, [at issue], could be construed as applying to and modifying the other clauses in the sentence, such a construction could not be adopted, for it would be construing an ambiguous stipulation in an insurance contract most favorably for the insurer and most unfavorably against the insured, which is exactly the reverse of the law.
Massachusetts Mut. Life Ins. Co. v. Boswell, 20 Ga. App. 446, 451, 93 S.E. 95 (1917). Accordingly, we reverse the trial court's grant of summary judgment in favor of Mercury, as well as its denial of Lee's motion for summary judgment in his favor, on the issue of coverage under the policy.
2. Misrepresentations in the Application. Lee asserts that the trial court also erred by granting summary judgment to Mercury based upon its conclusion that a misrepresentation in the policy application voided the policy. We agree.
OCGA § 33-24-7 provides:
(a) All statements and descriptions in any application for an insurance policy or annuity contract or in negotiations for such, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties.
(b) Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless:
(1) Fraudulent;
(2) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or
(3) The insurer in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for or would not have provided *740 coverage with respect to the hazard resulting in the loss if the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise.
In this case, the trial court relied upon subsections (b) (2) and (3) to prevent Lee's recovery under the policy.
(a) Effect of Uncontradicted Affidavit. Before addressing the particular facts of this case with regard to the alleged misrepresentation, our law in this area needs to be clarified; otherwise, "magic words" in the affidavit of an insurance company's employee or agent will be allowed to eviscerate the statutory requirement of "good faith" in subsection (b) (3).
There are several older panel decisions by this Court which hold that an "uncontradicted affidavit" from an underwriter or agent for the insurer averring that the policy would not have been issued had the true facts been known precludes any genuine issue of material fact with respect to whether the insurer in good faith would not have issued the policy. Burkholder v. Ford Life Ins. Co., 207 Ga. App. 908, 908-909 (1), 429 S.E.2d 344 (1993) ; Graphic Arts Mut. Ins. Co. v. Pritchett, 220 Ga. App. 430, 432-433 (2), 469 S.E.2d 199 (1995). In a later whole court decision, this Court clarified the law in this area, but neglected to overrule these decisions. Case v. RGA Ins. Svcs., 239 Ga. App. 1, 2-3 (1), 521 S.E.2d 32 (1999).
In Case, supra, the only evidence in support of the insurer's misrepresentation claim was an affidavit from the director of underwriting stating that the insurance company would not have issued the policy if it had known a member of the insured's household had a negative driving history. We applied a long-standing rule "that summary judgment can never issue based upon opinion testimony alone," and reversed the trial court's grant of summary judgment in favor of the insurer. (Citation and punctuation omitted.) 239 Ga. App. at 2-3 (1), 521 S.E.2d 32. The rationale for this rule is that "opinion testimony is always a question of acceptance or nonacceptance on the part of the jury." (Citation and punctuation omitted.) Id. at 2 (1), 521 S.E.2d 32. We explained that we could not *128 "adopt a holding which provides that summary judgment must go to the insurer if the insurer's employee provides his employer with a favorable opinion in the requisite affidavit. The test for materiality of a representation in an insurance application should not be based upon such procedural gaming...." *741 Id. at 2 (1), 521 S.E.2d 32 While the opinion testimony rule has subsequently been limited to cases in which expert testimony is not required,[13] our holding in Case still applies to the affidavit of an underwriter opining that his employer would not have issued a particular policy if additional facts had been disclosed.
Our holding in Case also comports with the plain language of the statute, which places the burden on the insurance company to demonstrate that it "in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for...." (Emphasis supplied.) OCGA § 33-24-7 (b) (3). See also Thompson v. Permanent Gen. Assur. Corp., 238 Ga. App. 450, 451, 519 S.E.2d 249 (1999) (burden of proof on insurer to demonstrate that misrepresentation was material before rescinding policy). In other contexts, the Supreme Court of Georgia has held that "[t]he question of the insurer's good faith (or lack thereof) is one of fact for the jury...." Binns v. MARTA, 250 Ga. 847, 848, 301 S.E.2d 877 (1983). "Good faith is always a question for the jury. Even though the party may swear he acted in good faith, the jury may decide he acted in bad faith from consideration of facts and circumstances in the case." (Citations and punctuation omitted; emphasis supplied.) Builders Transport v. Hall, 183 Ga. App. 812, 816 (2), 360 S.E.2d 60 (1987).
Our holdings in Graphic Arts, supra, and Burkholder, supra, however, allow an insurer to automatically establish good faith though an employee's affidavit stating hypothetically, and after a loss has occurred, that the company would not have issued the policy if the true facts had been known. In most cases, it will be difficult for the insured to "contradict" a statement that is subjective and by its very nature opinion testimony. In keeping with our holding in Case, supra, the plain language of the statute, and our law concerning good faith generally, we overrule the above-referenced holdings in Graphic Arts and Burkholder. To the extent our opinion in T. J. Blake Trucking v. Alea London, Ltd., 284 Ga. App. 384, 643 S.E.2d 762 (2007), also stands for the proposition that an uncontroverted affidavit from an insurance company's underwriter precludes a finding of a genuine issue of material fact on the issue of good faith, it is disapproved.
(b) Materiality. The test for materiality under OCGA § 33-24-7 (b) (2) is an objective determination. "A material misrepresentation is one that would influence a prudent insurer in determining whether or *742 not to accept the risk, or in fixing a different amount of premium in the event of such acceptance." (Citations and punctuation omitted; emphasis in original) Lively v. Southern Heritage Ins. Co., 256 Ga. App. 195, 196 (1), 568 S.E.2d 98 (2002). This is an objective standard for materiality. Id. See also Woods v. Independent Fire Ins. Co., 749 F.2d 1493, 1497 (11th Cir. 1985). Accordingly, just as with good faith, an affidavit from an insurer stating that certain information omitted from an application was material does not automatically entitle an insurer to void a policy. Additionally, the complete test for materiality must be considered. "In order to void a policy of insurance for a misrepresentation in the application [under OCGA § 33-24-7 (b) (2) ], the insurer must show that the representation was false and that it was material in that it changed the nature, extent, or character of the risk." (Citation and punctuation omitted; emphasis supplied.) Bear's Den, supra, 162 Ga. App. at 838 (3), 292 S.E.2d 502.
Finally, questions of good faith and materiality under OCGA § 33-24-7 (b) are "mixed question[s] of law and fact that can be decided as a matter of law if reasonable minds could not differ on the question." (Citation and punctuation omitted.)
*129 Woods, supra, 749 F.2d at 1497. A court may decide the issue as a matter of law "where the evidence excludes every reasonable inference except that it is material" or that the insurer has asserted its hypothetical decision in good faith. Ga. Farm Bureau Mut. Ins. Co. v. Richardson, 217 Ga. App. 201, 204 (1), 457 S.E.2d 181 (1995). In some cases, the nature of the particular misrepresentation, the coverage afforded by the policy, underwriting guidelines, and/or the negotiations between the parties,[14] in addition to an affidavit from a company underwriter, will allow a court to determine good faith and materiality as a matter of law. See, e. g., Pope v. Mercury Indem. Co., 297 Ga. App. 535, 538-539 (1), 677 S.E.2d 693 (2009).
(c) Issues of Fact in this Case. With a proper understanding of the law to apply in this context, we now turn to the particular facts of this case. In its order granting summary judgment, the trial court relied upon an affidavit from Mercury's director of underwriting averring:
Defendant would not in good faith have issued the homeowners insurance policy at issue nor would it have issued the policy for the premium rate charged for the insurance policy at issue in this case in 2010, had it known of the material *743 misrepresentations that were made in the aforesaid application, including the misrepresentations that the residence at issue was the Plaintiff's primary residence and occupied by the Plaintiff.
The underwriter provided no explanation in the affidavit or his deposition testimony about how the misrepresentations changed the nature, extent, or character of the risk. And as outlined above, this opinion testimony does not automatically entitle Mercury to summary judgment in its favor on the issue of good faith. Instead, we must look at all of the evidence in the case to determine whether it excludes every reasonable inference except that the misrepresentations were material or that the insurance company asserted its hypothetical decision in good faith.
With regard to materiality, Lee submitted the affidavit of an expert witness who opined that "[i]f a residence is occupied, whether the residence is primary or secondary is not material to the issuance of a policy for homeowner insurance and will not preclude coverage. Instead, many factors are considered such as whether the residence is vacant or rented." It is undisputed that Constable paid no rent and that the home was occupied. Other evidence in the record shows that Mercury would issue the same policy for a secondary home if it met the same physical requirements as a primary home as defined in the Mercury Insurance Company Georgia Homeowner Manual. The "Agent's Manual Georgia Homeowner" also stated that secondary dwellings were required to meet the physical requirements of a primary dwelling. Mercury's underwriter testified that physical requirements relate to items like the age of the house and the heating, electrical, and plumbing systems of the home. He confirmed that a survey of Lee's home showed that the age of the home, its condition, its roof, its distance from fire protection services, slope, natural hazards, security, along with numerous other factors, fulfilled the physical requirements of a primary dwelling. The only portion of the home not meeting Mercury's physical requirements was the presence of a diving board, which was removed from the home at Mercury's request. After the removal of the diving board, the home fulfilled all the physical requirements of a primary dwelling. Finally, the Agent's Manual states: "The base rate for a secondary location is calculated ... by rating the dwelling as though it were a primary location, then applying a 5% credit to the base premium."
This evidence creates genuine issues of material fact as to whether Mercury has asserted in good faith that it would not have issued the policy in the first instance and whether it would have charged a higher rate if it had known the true facts. See *744 Lively, supra, 256 Ga. App. at 196 (1), 568 S.E.2d 98 (finding issues of fact where underwriter failed to set forth "any bright-line *130 company policies" in affidavit containing only "blanket statements that she would not have issued the policy if she had known of the [insured]s' prior history" and insured submitted expert affidavit averring that the prior history would not automatically preclude coverage). It also creates genuine issues of material fact with regard to whether the misrepresentation was "one that would influence a prudent insurer in determining whether or not to accept the risk, or in fixing a different amount of premium in the event of such acceptance." (Emphasis in original.) Id. Mercury has presented no evidence showing how the misrepresentation changed the nature, extent, or character of its risk. We therefore reverse the trial court's grant of summary judgment to Mercury on the issue of misrepresentation.
(d) Dual Agency. Lee asserts, in the alternative, that even if the misrepresentation were material, issues of fact exist with regard to whether Arnold was a dual agent. In support of this assertion, he cites well-established law that an insurance company is estopped from voiding a policy based upon misrepresentations in the application "if actual knowledge of the true state of facts is legally imputable to it." Reserve Life Ins. Co. v. Bearden, 96 Ga. App. 549, 550 (1), 101 S.E.2d 120 (1957). "An insurer cannot justly assert reliance upon a representation it knows to be false, or is properly charged with knowing to be false." Peek v. Southern Guar. Ins. Co., 240 Ga. 498, 500 (2), 241 S.E.2d 210 (1978). Accordingly, if Arnold acted as an agent for both Mercury and Lee, his alleged knowledge about the home being a secondary residence can be imputed to Mercury. In Georgia, an agency relationship is created "wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1.
In this case, issues of genuine material fact exist as to whether Arnold may have been an express agent of Mercury, in addition to acting as Lee's agent to procure the policy. Evidence supporting this conclusion includes: Arnold had authority to bind an insurance policy with Mercury after he entered a client's information into a form application on Mercury software on his computer system and he did so for Lee in this case; Arnold always submitted applications to Mercury "bound"; the director of underwriting for Mercury confirmed that when it receives applications from an agent, "it is typically already bound for coverage in accordance with the rules in our manual"; the "Binder" section of Lee's application stated: "Provided this binder is signed by the Representative, insurance is bound 30 days from the effective date shown, unless cancelled sooner by notice or a policy is issued"; Arnold signed the binder as the "representative"
*745 of Mercury; Arnold testified that he sent an "Evidence of Property Insurance" form to Lee which stated "Mercury Insurance Company of Georgia" at the top and "Authorized Representative" underneath his signature; and Arnold was also authorized to accept payments for policies.[15]
The evidence cited by Mercury to support its sparse argument[16] that Arnold was not a dual agent as a matter of law is limited to two facts. First, Arnold agreed in his deposition that he was an independent agent because "[t]hat's what our name is. We are-we have an association with the Independent Agents of Georgia" Second, Arnold's contract with Mercury stated that he was an independent contractor rather than an employee. But, "[a]n independent contractor may also be an agent." (Citations and punctuation omitted.) Nat. Home Life Assur. Co. v. Hawkins, 151 Ga. App. 60, 258 S.E.2d 913 (1979).
"While an independent insurance agent or broker is normally considered the agent of the insured, it can also, depending on the specific facts of each case, be a dual agent for both the insurer and the insured."
*131 (Citations and punctuation omitted.) Bowen Tree Surgeons v. Canal Indem. Co., 264 Ga. App. 520, 522, 591 S.E.2d 415 (2003). Based upon the evidence that Arnold had authority to bind Mercury, issues of fact exist with regard to dual agency. See id. (finding issues of fact on dual agency where agent "customarily accepted premiums and notices of premiums on [insurance company's] behalf"). Compare Canal Ins. Co. v. Harrison, 189 Ga. App. 681, 683 (1), 376 S.E.2d 923 (1988) (concluding that, among other things, there was a lack of evidence that insurance agent was dual agent of insurer where unequivocal testimony showed that the agent could not bind coverage for the insurer). See also Sumitomo Marine & Fire Ins. Co. v. Southern Guar. Ins. Co., 337 F.Supp.2d 1339, 1353 (N.D. Ga. 2004) (insurance agent also agent of insurer based upon evidence showing, in part, that agent signed certificates of insurance as "authorized representative" and could bind coverage).
3. Estoppel. In another alternative argument, Lee contends that genuine issues of material fact exist with regard to whether Mercury is estopped from voiding the contract based upon the lengthy delay between when it learned of the misrepresentation and its denial of coverage. We agree.
*746 If an insurer seeks to void a policy on the grounds of misrepresentation, it "must, upon discovery of the facts, at once announce [its] purpose and adhere to it. Otherwise, [it] cannot avoid or rescind such contract." (Citation and punctuation omitted.) Lively, supra, 256 Ga. App. at 198 (2), 568 S.E.2d 98. "One significant reason for this rule in insurance cases is that leading the insured to believe the validity of the policy is not questioned lulls the insured into not purchasing other insurance and thus subjects the insured's property to continuing non-coverage." Florida Intl. Indemn. Co. v. Osgood, 233 Ga. App. 111, 113-114 (1), 503 S.E.2d 371 (1998).
The record shows that the fire occurred on May 5, 2012. On May 9, 2012, the Clayton County Fire Department closed its investigation into the cause of the fire based upon its opinion that it was accidental. On May 12, 2012, Lee gave a recorded statement to Mercury during a walk-through of the residence. In this recorded statement, Lee disclosed that he was not present at the time of the fire because he was at his home in South Carolina. On June 5, 2012, Lee gave a second recorded statement to a different adjustor in which he also disclosed that he lived in South Carolina and stayed at the house when traveling for work in Georgia.
On June 15, 2012, counsel for Mercury advised Lee that it had been retained "to advise [Mercury] regarding its rights and obligations during its investigation" of the fire loss. Counsel requested that Lee "submit a signed, sworn proof of loss for the loss, which includes detailed information about the damages being claimed." On July 31, 2012, counsel for Mercury sent a letter to Lee acknowledging receipt of the proof of loss and stated that it was not being accepted or rejected "at this time, but rather is being held without action pending the completion of Mercury's investigation." It also confirmed that Mercury had requested an examination under oath. Lee provided an examination under oath on August 3, 2012, and confirmed once again that the home was a secondary residence.
On August 13, 2012, Mercury renewed Lee's policy on the property based upon a premium payment of $1,221. On September 7, October 12, and November 13, 2012, Mercury sent identical form letters to Lee stating that it would provide him "with its evaluation of the claim and the terms, exclusions, conditions and other provisions of the policy that may apply to your claim once Mercury has completed its investigation." The record is silent as to what investigation remained to be completed at the time these letters were sent, and it does not show that Mercury asked for any additional information from Lee after his statement under oath on August 3, 2012. After receiving the form letters, Lee "felt compelled to seek the advice of and retain an attorney."
*747 On December 2, 2012, Lee's attorney notified Mercury's counsel that he had been retained to advise Lee about his rights under the policy. He made a demand for payment within 60 days and stated, "Mr. Lee has *132 made several attempts to reach a settlement with Mercury since the loss.... With each attempt at settlement, Mr. Lee has received the same generic response letter and has not received any substantial information about the status of his claim."
On December 6, 2012, a Mercury claims analyst sent Lee a letter informing him for the first time that it was voiding his policy based upon the material misrepresentation in his application that the insured location was his primary residence. Checks dated November 28, 2012, in the amount of premiums paid by Lee were included with the letter. Lee's expert opined in his affidavit that Mercury should have completed its investigation within 90 days from the date of the fire.
This evidence creates genuine issues of material fact as to whether Mercury is estopped from asserting that the policy was void. At best, Mercury knew all it needed to know about Lee's primary residence by the August 3, 2012 examination under oath, yet continued to send form letters to Lee regarding its outstanding investigation into matters unknown. At worst, it knew at the time of either his May 12th or June 5th recorded statement. But it did not notify Lee of its intent to void the policy until after it received a letter from his recently retained counsel demanding payment. Moreover, it renewed his policy after learning about alleged misrepresentations in the application. We therefore find that genuine issues of material fact exist on the issue of estoppel or waiver. See American Safety Indem. Co. v. Sto Corp., 342 Ga. App. 263, 271-272 (4), 802 S.E.2d 448 (2017) (affirming grant of summary judgment to insured on insurer's counterclaim for rescission based upon unexplained six-month delay in notifying insured of intent to void policy); Lively, supra, 256 Ga. App. at 198-199, 568 S.E.2d 98 (reversing grant of summary judgment to insurer based upon genuine issues of material fact as to whether insurer waived defense that policy was void by failing to take such position until one year after learning of misrepresentations in application); Thompson v. Permanent Gen. Assur. Corp., 238 Ga. App. 450, 451, 519 S.E.2d 249 (1999) (renewal of insurance policy evidence of waiver of grounds to void policy).
The dissent relies upon statutes and case law providing generally that an insurer should not be penalized for investigating a claim.[17] But the record before us does not show the nature of any *748 continued investigation by Mercury after the August 3, 2012 examination under oath. The form letters asserting an unspecified investigation are insufficient to mandate summary judgment in Mercury's favor on the issue of estoppel in light of the other evidence that it was aware of all of the facts surrounding Lee's primary residence by the time of the examination under oath. We have previously concluded that an insurer's assertion that its actions were part of a necessary investigation to avoid possible bad faith liability is insufficient to warrant summary judgment in the insurance company's favor on the issue of estoppel. Lively, supra, 256 Ga. App. at 198-199 (2), 568 S.E.2d 98. Additionally, Mercury's renewal of the policy and failure to notify Lee of its intent to void the policy subjected his property to continuing non-coverage. See Osgood, supra, 233 Ga. App. at 115 (1), 503 S.E.2d 371 (retention of premium and failure to announce policy is void communicates that policy is honored). Accordingly, issues of fact exist with regard to detrimental reliance and estoppel.[18] *133 4. Bad Faith. Lee argues that the trial court erred in granting summary judgment in favor of Mercury on the issue of bad faith. We disagree.
"Penalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact." (Citation and punctuation omitted.) American Safety Indem. Co., supra, 342 Ga. App. at 273 (5), 802 S.E.2d 448. "Ordinarily, the question of bad faith is one for the jury. However, when there is no evidence of unfounded reason for the nonpayment, or if the issue of liability is close, the court should disallow imposition of bad faith penalties." (Citation and punctuation omitted; emphasis in original.) Id. This rule applies even if genuine issues of fact exist with regard to whether the insurer's conduct in denying the claim, in part, may have been based upon bad faith. Id. at 274 (5), n. 13, 802 S.E.2d 448.
*749 See Auto-Owners Ins. Co. v. Neisler, 334 Ga. App. 284, 290 (2), 779 S.E.2d 55 (2015) (defense that shows "reasonable and probable cause for making it would vindicate the good faith of the [insurance] company as effectually as would a complete defense to the action") (citations omitted). As we cannot say that Mercury had no reasonable grounds to contest Lee's claim, we affirm the trial court's grant of summary judgment to Mercury and the denial of summary judgment to Lee on the issue of Mercury's bad faith.
5. Motion to Compel. Lee contends that the trial court erred by denying his motion to compel production of Mercury's claim file and communications with its attorneys. We disagree.
A "trial court's discretion in dealing with discovery matters is very broad, and this [C]ourt has stated on numerous occasions that it will not interfere with the exercise of that discretion absent a clear abuse." de Castro v. Durrell, 295 Ga. App. 194, 204 (3), 671 S.E.2d 244 (2008). And our Supreme Court has held that
OCGA § 9-11-26 (b) (3) generally prohibits the compelled disclosure of materials "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative" unless the party seeking their disclosure shows (1) that it has a "substantial need" for the materials to prepare its case and (2) that it is "unable without undue hardship to obtain the substantial equivalent of the materials by other means."
(Citation omitted.) St. Simons Waterfront, LLC v. Hunter, Maclean, Exley & Dunn, P.C., 293 Ga. 419, 429 (2), 746 S.E.2d 98 (2013).
Lee asserts that the claim files and attorney-client communications are necessary to support his claim of bad faith based upon Mercury's delay in denying his claim and the thoroughness of its investigation.[19] For the reasons stated above, however, Mercury is entitled to summary judgment on Lee's bad faith claim. Accordingly, Lee no longer has the asserted need for the documents and we affirm the trial court's denial of his motion to compel.
6. Motion to Strike. In his remaining enumeration of error, Lee argues that the trial court erred by denying his motion to strike the affidavit of Mercury's director of underwriting, Kevin Bailey. The record shows that Lee moved to strike the affidavit, in whole or in *750 part, because it was "contradicted by his prior sworn testimony and is conclusory and without reference to any factual basis, but is submitted only in an attempt to contradict previous sworn testimony." The motion did not specify which portions of the affidavit Lee sought to strike. In the hearing on the motion for summary judgment, Lee's counsel clarified that he sought to strike the portion of Bailey's affidavit stating that Mercury would not have *134 issued the policy had it known the true facts about Lee's primary residence. Based upon Bailey's deposition testimony that he was not personally involved in underwriting Lee's policy, Lee asserted that Bailey had "no personal knowledge or basis about any portion of the way the underwriting went." Lee also pointed out that Bailey offered no information to support his conclusion.
While Bailey offered no specific facts to support his conclusion that Mercury would not have issued the policy if it had known the true facts, he also averred that, as Mercury's director of underwriting, he was familiar with the company's policies and practices at the time Lee's application was issued and thus his responsibilities included determining whether a particular "application for insurance meets the company's guidelines for acceptance of a risk." As Bailey possessed the requisite knowledge to provide an opinion about whether Mercury would have issued the policy, the trial court properly denied Lee's motion to strike Bailey's affidavit. See T. J. Blake Trucking, supra, 284 Ga. App. at 385 (1), 643 S.E.2d 762.
Conclusion
In sum, we reverse the trial court's grant of summary judgment in favor of Mercury Insurance with regard to all issues other than bad faith, grant Lee's motion for summary judgment on the issue of coverage under the policy, and affirm the trial court's denial of Lee's motion to strike and motion to compel.
Judgment affirmed in part, reversed in part.
Barnes, P. J., Miller, P. J., Ellington, P. J., Rickman, Mercier and Reese, J.J., concur. McFadden, P. J., and McMillian, J., concur specially in Division 1 and concur fully with Divisions 2, 3, 4, 5 and 6. Doyle, J. concurs fully with Divisions 2, 3, 4, 5 and 6 and in judgment only as to Division 1. Dillard, C. J., Ray, P. J., Andrews, Branch, and Bethel, J.J., concur in the judgment only as to Divisions 4, 5 and 6, and dissent to Divisions 1, 2 and 3.
McDadden, Presiding Judge, concurring fully in part and specially in part.
*751 I agree that the policy language does not preclude coverage. But I reach that conclusion by a shorter route than the majority. So I concur specially in Division 1 of the majority opinion and fully in the remaining divisions.
The policy covers a "dwelling on the residence premises shown in the Declarations used principally as a private residence[.]" (Emphasis supplied.) The words "a ... residence" encompass the property at issue here, even though Lee does not use the property as his primary residence. "A" is the indefinite article (as opposed to the definite article, "the"); "a" "refer[s] to a person or thing that is not identified or specified." https://www.merriam-webster.com/dictionary/indefiniteärticle (accessed Oct. 26, 2017). As for "residence," one "may have several residences, but only one place of domicile." Avery v. Bower, 170 Ga. 202, 204, 152 S.E. 239 (1930) ; Kean v. Marshall, 294 Ga. App. 459, 461 (1), 669 S.E.2d 463 (2008) ; Baldwin v. State Farm Fire & Cas. Co., 264 Ga. App. 229, 230 (1), 590 S.E.2d 206 (2003) (citation and punctuation omitted). The property at issue here is shown on the Declaration page and there is evidence that Lee sometimes resided there. So the policy's use of the phrase "a ... residence" does not entitle the insurer to deny coverage on the basis that the insured property was not Lee's domicile.
I also write separately because I disagree with the dissent's criticisms of Lee's brief. Whether his argument about this policy language is "threadbare" is, I suppose, a matter of opinion. I found his brief ably prepared and his argument on that issue sufficient.
But the dissent falls into serious error when it declares that Lee's enumeration of errors is legally insufficient. Lee enumerated as error the grant of the insurer's motion for summary judgment and the denial of his own motion for summary judgment. That is sufficient. Contrary to the dissent's assertion, an argument need not be enumerated as error.
In appellate practice, an error of law is "a false or mistaken conception or application of the law. Such a mistaken or false conception or application of the law to the *135 facts of a cause as will furnish ground for a review of the proceedings." Black's Law Dictionary (5th ed.). An error of law has as its basis a specific ruling made by the trial court.... The individual facets of [Lee's] attack on the legal ruling with which [he] took issue are arguments in support of a legal position and are not, in and of themselves, errors of law. Because the arguments supporting a position concerning a legal ruling *752 are not themselves legal rulings, they do not have to be enunciated in the enumeration of errors in order to merit appellate consideration. Such arguments, however, must be addressed by the appellate court if necessary to its decision on the issue of the propriety of the trial court's ruling.
Felix v. State, 271 Ga. 534, 539-540, 523 S.E.2d 1 (1999) (punctuation omitted).
I am authorized to state that Judge McMillian joins in this concurrence.

Lee asserts in the alternative that issues of fact exist with regard to his right to recover bad faith damages.

We disagree with the dissent's assertion that the issue of coverage has been abandoned by the insured in this case pursuant to Court of Appeals Rule 25 (c) (2). We have "recognized that abandonment under Rule 2[5] (c) (2) applies only where the party has made no meaningful argument, e.g., referenced only the language in the enumeration, or demonstrated by a lack of interest that the enumeration possesses no merit." (Citations and punctuation omitted.) American Central Ins. Co. v. Lee, 273 Ga. 880, 883 (2), 548 S.E.2d 338 (2001). Here, the entire case revolves around whether Lee is entitled to insurance proceeds as a result of the fire, and it cannot fairly be said that his brief made no meaningful argument or demonstrated a lack of interest on the issue of coverage under the policy. Moreover, even if we could somehow deem the argument abandoned under Rule 25 (c) (2), we are not obligated to and should not do so in this case. See Woods v. Hall, 315 Ga. App. 93, 96, 726 S.E.2d 596 (2012) (exercising discretion to review enumerations of error on the merits even though none of the enumerated errors relating to trial court's grant of summary judgment were "supported by citations to the record or argument"). See also Janet Ricker Builder v. Gardner, 244 Ga. App. 753, 754, 536 S.E.2d 777 (2000) (exercising discretion to consider main arguments presented on appeal to overturn trial court's grant of summary judgment).

While the policy provides a definition for "[i]nsured location," this definition is not implicated in determining coverage for loss of the dwelling due to a fire. Instead, it comes into play in the portion of the policy providing "Coverage F-Medical Payments To Others."

While the application instructed the insured to "check all that apply" and listed "primary" and "occupied by Named Insured," as options to select, the policy did not incorporate the application by reference and the application does not state that it would become part of the policy. Nor does the record show that the application was made a part of or attached to the policy; it appears as a separate exhibit to the complaint and in depositions. Additionally, the only reference in the policy to the application states only that Lee "agree[d] that the policy has been issued in reliance upon the statements in the Declarations and the application." Accordingly, the application should be considered to determine whether Mercury is entitled to void the policy based upon any misrepresentations contained in the policy as discussed, infra. The cases relied upon by the dissent are distinguishable. In West v. Rudd, 242 Ga. 393, 249 S.E.2d 76 (1978), the application stated "all answers to such questions, together with this agreement shall form the basis and become a part of any policy issued thereon." (Punctuation and emphasis omitted.) Id. In Canal Indem. Co. v. E.M.C. Motors, 227 Ga. App. 84, 85 (1), 488 S.E.2d 126 (1997), we noted the general rule that insurance contracts are construed according to terms in the policy and as modified by any "application made a part of the policy." (Citation omitted.). But in that case, the particular notice to the insured was attached to the policy. Even so, we nonetheless declined to consider language in the notice even though it was attached to the policy, because the notice expressly stated that it did not amend the policy. In this case, there is no evidence that the application was attached to the policy, and the policy language makes it relevant only to the issue of misrepresentation.

We disagree with the dissent's view that this interpretation would allow coverage "without any requirement that such dwelling be 'shown in the Declarations.' " (Emphasis in original.) The separate statement of coverage in the policy, which includes the reference to "residence premises," requires that the dwelling "be shown in the Declarations." Accordingly, the insurance company had no need to state this again in the definition of "residence premises," and the "tortured reading" posed by the dissent is an impossibility.

While the dissent implies that Bear's Den stands for the proposition that we should read in the disjunctive when there is neither a conjunctive or disjunctive term after a comma, we did so in that case because we were required to construe the ambiguity in favor of the insured. Here, the ambiguity requires a conjunctive reading.

Although research has revealed no other Georgia decisions addressing identical policy language, in Hill, supra, we concluded that the policy provided alternative definitions of "residence premises" based upon the use of a semicolon followed by the word "or." 214 Ga. App. at 717, 448 S.E.2d 747. Compare Varsalona v. Auto-Owners Ins. Co., 281 Ga. App. 644, 637 S.E.2d 64 (2006) ("policy ... defines 'residence premises' to mean 'the one or two family dwelling where you reside, including the building, the grounds and other structures on the grounds or that part of any other building where you reside, including grounds and structures which is described in the Declarations' ") (punctuation omitted; emphasis supplied); Kephart, supra, 211 Ga. App. at 424 (1) (a), 439 S.E.2d 682 (policy contained special provision stating "residence premises must be the only premises where the named insured or spouse maintains a residence other than business or farm properties") (punctuation omitted); Epps v. Nicholson, 187 Ga. App. 246, 370 S.E.2d 13 (1988) ("policy defines 'residence premises' as 'the one or two family dwelling, other structures, and grounds or that part of any other building where you reside and which is shown as the "residence premises" in the Declarations' ").

The dissent's reliance upon the parol evidence rule to dismiss this evidence is misplaced, because parol evidence is admissible to explain ambiguities in an insurance contract. See, e.g., Allstate Property & Cas. Ins. Co. v. Musgrove, 342 Ga. App. 777, ----, 804 S.E.2d 693 (2017).

This dictionary of American English was first published in 1889, and it went out of print in 1911. https://www.britannica.com/topic/Century-Dictionary-and-Cyclopedia.

See Ewing's Lessee, supra, relied upon by the dissent.

As with bills of legislation read aloud, the United States Supreme Court's decision in Ewing, supra, addressed punctuation in a jury charge, which is also read aloud. Scalia and Garner cite this decision in their book and expressly disagree with its statement that punctuation "should be relied on only 'when all other means fail.' " (Footnote omitted.) Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 161-162 (1st ed. 2012).

This Code section provides: "The rules of grammatical construction usually govern, but to effectuate the intention they may be disregarded...." (Emphasis supplied.) It is a tool to be used to correct "grammatical errors and omitted terms," Altamaha Riverkeeper v. Rayonier, Inc., Case No. CV214-44, 2015 WL 1505971, at *8, 2015 U. S. Dist. LEXIS 42849 at * 19-20, (S. D. Ga. 2015), if "necessary to effectuate the intention of the parties to the contract." Ardis v. Printup, 39 Ga. 648, 652 (2) (1869). In this case, such a correction would appear to be contrary to the intent of the insurer as demonstrated by the underwriter's testimony that the same policy would have been issued for a secondary residence. Accordingly, we conclude that the rules of grammatical construction govern.

See Savannah Valley Production Credit Assn. v. Cheek, 248 Ga. 745, 746-747, 285 S.E.2d 689 (1982) (opinion testimony may not be used to support judgment unless contention of fact is capable of proof only by expert testimony, such as medical or legal malpractice actions).

This list of possible evidence is not intended to be exhaustive; it is provided for purposes of illustration.

Arnold did not accept payments from Lee, because Lee's lender paid the premiums through Lee's escrow account.

Mercury's argument that Arnold's knowledge is irrelevant because Lee assumed that Constable must have signed the application is a red herring. The issue is Mercury's imputed knowledge of the true facts regarding Lee's residence, not whether the misrepresentation can be attributed to Lee because it may have been signed by his agent, Constable.

See OCGA § 33-24-40 ; R&G Investments & Holdings v. American Family Ins. Co., 337 Ga. App. 588, 599 (4) (b), 787 S.E.2d 765 (2016) (holding investigation without proper reservation of rights did not result in waiver or estoppel; timing of knowledge of misrepresentation not discussed); Brazil v. Govt. Employees Ins. Co., 199 Ga. App. 343, 344 (1), 404 S.E.2d 807 (1991) (holding insurer entitled to investigate before denying claim).

The estoppel cases cited by the dissent do not mandate a different result as none of them involved the issue of whether an insurance company was estopped from asserting that a policy was void based upon a misrepresentation in an application. See Robinson v. Boyd, 288 Ga. 53, 701 S.E.2d 165 (2010) (deciding whether plaintiff estopped from pursuing action because it concealed filing of suit); Capital City Developers v. Bank of North Ga., 316 Ga. App. 624, 730 S.E.2d 99 (2012) (addressing whether bank estopped from pursuing deficiency judgment); Ga. Farm Bureau Mut. Ins. Co. v. Vanhuss, 243 Ga. App. 26, 532 S.E.2d 135 (2000) (insurance company not estopped to seek declaratory judgment that it had no duty to defend based upon its earlier decision to defend underlying lawsuit; no detrimental reliance resulted from defense provided by insurer); Allstate Ins. Co. v. Sapp, 223 Ga. App. 443, 477 S.E.2d 869 (1996) (deciding that insurance company not estopped from denying coverage based upon statements by insured about existence of coverage in criminal case).

Lee does not assert on appeal that he is entitled to this information to support his claim that Mercury is estopped from voiding the policy.